573 A.2d 1376

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
THOMAS E. LUND, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MICHAEL X. HARRISON, DEFENDANT–APPELLANT.

Argued January 2, 1990—Decided May 23, 1990.

*James Michael Merberg,* a member of the Massachusetts bar, argued the cause for appellant Thomas E. Lund (*Robert S. Eisenberg,* attorney).

*Lois De Julio,* First Assistant Deputy Public Defender, argued the cause for appellant Michael X. Harrison (*Alfred A. Slocum,* Public Defender, attorney; *Lois De Julio* and *James Mayer,* Designated Counsel, of counsel and on the briefs).

*Janet Flanagan,* Deputy Attorney General, argued the cause for respondent (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

## O'HERN, J.

The Attorney General informs us in his brief:

One study of State Police officers killed nationwide in the line of duty from September 1976 to September 1982, shows that 40 percent of the troopers killed by gunfire were fatally wounded while making traffic stops.

Of such reality, Chief Justice Hughes spoke some years back:

Such continuing trends would make even more relevant today the prophetic warning of the United States Supreme Court in *Terry v. Ohio,* [392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968)] dealing with police exposure and apprehension of harm:

> We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. * * *
>
> * * * [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. [*State ex rel. H.B.,* 75 *N.J.* 243, 247, 381 *A.*2d 759 (1977) (quoting *Terry v. Ohio,* 392 *U.S.* 1, 23–24, 88 *S.Ct.* 1868, 1881, 20 *L.Ed.*2d 889, 907–08 (1968)).]

This case involves an application of the *Terry* principles in the context of a highway stop of a vehicle during which a police officer discovered drugs in the motorist's car.

## I

The principles that guide us are settled:

Certain fundamental propositions bear restatement at the outset. The Fourth Amendment to the United States Constitution requires the approval of an impartial judicial officer based on probable cause before most searches may be undertaken. *E.g., Chambers v. Maroney,* 399 *U.S.* 42, 51, 90 *S.Ct.* 1975, 1981, 26 *L.Ed.*2d 419, 428, *reh. den.,* 400 *U.S.* 856, 91 *S.Ct.* 23, 27 *L.Ed.*2d 94 (1970). The same holds true for Article 1, paragraph 7 of the New Jersey Constitution. *State v. Ercolano,* 79 *N.J.* 25, 41–42 [397 *A.*2d 1062] (1979), and cases cited therein. The warrant requirement of these provisions may be dispensed with in only a few narrowly circumscribed exceptions. The *prima facie* invalidity of any warrantless search is overcome only if that search falls

38

within one of the specific exceptions created by the United States Supreme Court. *Ercolano, supra,* 79 *N.J.* at 42 [397 *A.*2d 1062]. Where, as here, the State seeks to validate a warrantless search, it bears the burden of bringing it within one of those exceptions. *State v. Sims,* 75 *N.J.* 337, 352 [382 *A.*2d 638] (1978). [*State v. Patino,* 83 *N.J.* 1, 7, 414 *A.*2d 1327 (1980).]

Because no warrant existed for the search, we must ask under which exception the search may be brought. The problem with this case, as with so many others, is that the search fits neatly into no category, although arguably fitting into several. It partakes of aspects of a "stop," an intrusion less than a search or seizure, as well as a search. Each of these strands of search and seizure law must be considered.

■ This was not a search incident to an arrest of the recent occupant of an automobile as defined in *New York v. Belton,* 453 *U.S.* 454, 101 *S.Ct.* 2860, 69 *L.Ed.*2d 768 (1981) (allowing a search of the car's interior as incident to the arrest). Nor was it an automobile exception case, because the officers did not have probable cause to believe the vehicle contained contraband. It has always been recognized that although expectations of privacy in the contents of an automobile are significant, they have never been granted the protection accorded the home. *State v. Patino, supra,* 83 *N.J.* at 8, 414 *A.*2d 1327. Thus, under the automobile exception, police may stop and search a moving vehicle, or one readily movable, when there is probable cause to believe that the vehicle contains criminally-related objects. "The rationale for this exception is grounded in the exigent circumstances created by the inherent mobility of vehicles and the somewhat lessened expectation of privacy in one's vehicle." *Id.* at 9, 414 *A.*2d 1327. As a result, an automobile search is justified not by the existence of a warrant but by the circumstances that furnish the officers with probable cause. In *State v. Alston,* 88 *N.J.* 211, 440 *A.*2d 1311 (1981), we stressed the significance of weapons when these are the object of the search because of concern for the safety of the police officers. There we upheld a search of a car that revealed two handguns and a sawed-off shotgun after the police had

seen live shotgun shells when shining a flashlight into the open glove compartment.

Another recognized exception to the probable-cause requirement allows the police to "stop and frisk" when a police officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest * * *." *Terry v. Ohio*, 392 *U.S.* 1, 27, 88 *S.Ct.* 1868, 1883, 20 *L.Ed.*2d 889, 909 (1968). In that circumstance, the officer's conduct is judged by "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Ibid.* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909. Chief Justice Warren emphasized that the new exception to probable cause was to be applied only in very limited circumstances. He stated that "[t]he sole justification [for the new standard was] the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Id.* at 29, 88 *S.Ct.* at 1884, 20 *L.Ed.*2d at 911.

In *Pennsylvania v. Mimms*, 434 *U.S.* 106, 98 *S.Ct.* 330, 54 *L.Ed.*2d 331 (1977), the Court upheld, without finding of probable cause, the brief detention or stop of the driver of a car outside his vehicle while the police officer issued a traffic summons. The Court reasoned that the detention involved only an incremental intrusion beyond an initial justified stop. The Court balanced that intrusion suffered by the individual against the heightened danger to the police officer in both dealing with people and automobiles and standing exposed to traffic. *Id.* at 111, 98 *S.Ct.* at 333, 54 *L.Ed.*2d at 337.

In *New York v. Class*, 475 *U.S.* 106, 106 *S.Ct.* 960, 89 *L.Ed.*2d 81 (1986), the Court authorized a limited search for a vehicle identification number on the theory that because the number is generally visible from outside an automobile, a police officer may reach in and move papers obscuring it from view. The

Court reasoned that the regulatory importance of the number resulted in a diminished expectation of privacy, and therefore police acted properly in moving the papers after they had stopped the car for a traffic violation and the driver had stepped out voluntarily. The plain view doctrine authorized the subsequent seizure of a gun.

Finally, in *Michigan v. Long*, 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201 (1983), the Court upheld the right of police to conduct a weapons search of the interior of a car when they have a reasonable belief that the motorist is potentially dangerous. In upholding the search, Justice O'Connor's opinion for the Court explained that a search of the passenger compartment of an automobile is "permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049, 103 *S.Ct.* at 3480, 77 *L.Ed.*2d at 1220 (quoting *Terry v. Ohio, supra,* 392 *U.S.* at 21, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 906).

We may summarize the essence of these protective principles again in the words of Chief Justice Hughes:

"Our evaluation of the proper balance that has to be struck * * * leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." * * *

Accepting these rules as representing bedrock constitutional law, it remains to apply them to the factual base [of the case]. [*State ex rel. H.B., supra,* 75 *N.J.* at 248, 381 *A.*2d 759 (quoting *Terry v. Ohio, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909).]

## II

For purposes of the application of the stated principles to the facts of this case, we may accept generally the statement of facts set forth in the State's Appellate Division brief.

On the clear, dry evening of October 21, 1984, at approximately 6:55 p.m., while routinely patrolling the northbound East Brunswick section of the New Jersey Turnpike, a New Jersey State Trooper noticed a 1978 Toyota with Florida license plates traveling in the center lane in violation of *N.J.S.A.* 39:4–82 (requiring keeping to right except to pass) and *N.J.S.A.* 39:4–88 (restricting center lane traffic when lanes are marked). The defendants were driver and passenger in the car. The trooper followed the car for about one mile and then pulled alongside it to make further observations. He then saw that the car, which was still in the center lane, had reflecting materials on the side and rear windows, which he testified was contrary to statute.

As a result of his observation of these traffic offenses, the trooper signaled the driver to stop on the right shoulder of the Turnpike. The trooper then pulled directly behind defendants' car. Before the trooper left his police vehicle, the driver turned around to his left side, toward the back seat, and reached toward the back seat. The trooper's view did not allow him to see what the driver was doing. The trooper approached the passenger side of the vehicle, and as he did so, he saw a cotton windbreaker stuffed into the lower left-hand corner of the back seat in the vicinity of the movement that he had previously observed. He also saw an open travel bag on the rear seat, with a brown paper bag on top of it. The trooper requested the driver's license and registration. The operator, who appeared nervous, produced a Massachusetts license and car-rental agreement but not a car registration. In the trooper's words, the driver "would stop in mid-sentence, his voice was cracking, and [he was] just generally nervous." Observing that the driver "kept looking toward the back seat slightly," the trooper thought, based on his training and experience, that this display of nervousness was unusual for someone who had been stopped for a routine motor vehicle violation. The trooper himself had been shot during such a routine motor vehicle stop about a year before. He then asked the two occupants to step out, after

which he conducted a *Terry*-type frisk of both that revealed no weapons.

The driver and passenger were then ordered to stand to the right front of their vehicle and were watched by another trooper who in the interim had arrived on the scene. The first trooper returned to the car and removed the jacket. On removing the jacket, the trooper saw a white towel sticking out about five inches from the back seat. When he pulled at the towel, it did not move. He then reached into the crevice of the seat, felt a hard object, and reached "around the back seat" to remove that object, a large manila envelope. The officer said that based on his training and experience, he believed that the object in the envelope was a weapon or a controlled dangerous substance. When he opened the envelope he found another hard object inside—a yellow plastic wrapper around another clear plastic wrapper containing what the officer suspected to be, and has been admitted to be, a large quantity of cocaine.

A Middlesex County indictment charged both Lund and Harrison with possession of cocaine and possession of cocaine with intent to distribute. Each moved to suppress the evidence of the cocaine. The Law Division denied the motion, ruling that under *Michigan v. Long, supra,* 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201, the officer had a reasonable belief that the occupants of the car may have been dangerous and that he therefore had the right to search the passenger compartment for weapons. Thus, the officer properly removed the jacket in the back seat of the vehicle. With regard to the subsequent actions with respect to the towel, he ruled that "a towel is not a container," and held that it was not unreasonable for the trooper to open the envelope to determine whether the object inside was a weapon. Following the denial of the motion, both defendants entered conditional pleas of guilty to the offenses. Both were sentenced to custodial terms. In an unreported opinion the Appellate Division upheld their convictions, ruling that the actions of the police were "reasonable and necessary for protective purposes in these circumstances," and the search

of the containers was reasonable, necessary, and constitutionally proper. We granted the defendants' petitions for certification. 114 *N.J.* 480, 481, 555 *A.*2d 606 (1989).

### III

No one disputes that not every motor vehicle stop establishes the basis for a car search. The touchstone of decision obviously will be found in the facts of each case. *Michigan v. Long, supra,* 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201, illustrates the principle. *Long* establishes that officers must possess objective cause before intruding into constitutionally-protected areas. In *Long,* two sheriff's deputies saw the defendant's car traveling fast and erratically along a lonely and deserted road in the early morning hours. The officers stopped the vehicle and Long, the only occupant, met them at the rear of the car. After Long failed to produce his vehicle registration, the officers noticed that he "appeared to be under the influence of something." *Id.* at 1036, 103 *S.Ct.* at 3473, 77 *L.Ed.*2d at 1211. As Long headed for the vehicle, apparently to retrieve his registration, the officers followed him and observed a large hunting knife in plain view in the car. The deputies then subjected Long to a *Terry* protective search and examined the interior of his vehicle by shining a flashlight through a window. As a result of that search, the deputies discovered marijuana, which they seized. The Court concluded, on the basis of the plain-view observation of the large hunting knife and a suspect who appeared to be under the influence of something, that the officers possessed a reasonable belief that the driver threatened their safety because he might gain access to a weapon. *Id.* at 1049–50, 103 *S.Ct.* at 3480–81, 77 *L.Ed.*2d at 1220.

Other cases emphasize the same norms of concern for police safety when dealing with armed and dangerous people. In *Commonwealth v. Almeida,* 373 *Mass.* 266, 366 *N.E.*2d 756 (1977), a cruiser patrolling a high-crime area just after midnight

stopped alongside an automobile. The car was parked with the driver in the driver's seat. The engine was running and the lights were out. Because the area was known for its high rate of crime, the officer decided to investigate and asked the driver if he had a registration. In what the policeman perceived to be a suspicious way the driver then lifted the cover to the console located between the driver and passenger seats to retrieve his wallet. Having ordered the driver to step outside, the officer opened the door to the vehicle and saw protruding from underneath the front seat what he recognized to be the holster of a gun. The policeman pulled out the holster. It had ammunition. He opened the console and found a fully-loaded automatic weapon. The *Almeida* court found the search to be strictly tied to and justified by the officer's reasonable belief that a gun might have been nearby endangering his safety.

We applied these same principles relating to the presence of weapons in *State v. Esteves*, 93 *N.J.* 498, 461 *A.*2d 1128 (1983), in which police officers were dispatched to investigate a possible robbery in progress at a local meat market. The dispatcher had related that a man with a gun was seen in an orange Volkswagen. On arriving at the scene, the police went first to the store. Next turning their attention to the car in the parking lot, the officers saw what appeared to be a small handgun between the front seats. The officers began to search the car for the identification. Their search of containers in the car uncovered drugs. We there concluded that "[w]hen a police officer 'has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest,'" *id.* at 506, 461 *A.*2d 1128 (quoting *Terry v. Ohio, supra*, 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909), and such an individual has left his vehicle and has been subjected to a *Terry* search, the limited search of the vehicle would be sustained because the "'defendants would have returned to their vehicle and, had there been a weapon, the weapon would then have been within the reach of the defendants,'" *id.* 93 *N.J.* at 507, 461 *A.*2d 1128 (quoting *State v.*

*Brown,* 160 *N.J.Super.* 227, 234, 389 *A.*2d 507 (Law Div.1978)). In *Brown* the court said: "Among the considerations leading to this conclusion [that the search was reasonable] is the fact that the incident occurred at 4 a.m., a time in which there is very little traffic, thus leading to the isolation of the officer. Further, there were three men in the car, * * * [and] the limited search of the vehicle was 'strictly tied to and justified by' the officer's suspicion that there may have been a weapon present endangering his safety." *Id.* at 234, 389 *A.*2d 507 (quoting *Terry, supra,* 392 *U.S.* at 19, 88 *S.Ct.* at 1878, 20 *L.Ed.*2d at 904). The suspect vehicle in *Brown* had been observed swerving between the marked lanes and tailgating another vehicle.

■ We recently had occasion to reconsider the *Terry* principles in *State v. Thomas,* 110 *N.J.* 673, 542 *A.*2d 912 (1988), in which we noted that whether there is good cause under the *Terry* rule for an officer to make a protective search incident to an investigatory stop is a question separate from whether it was permissible to stop the suspect in the first place. The search is judged by whether a reasonably prudent person would be warranted in the belief that his or her safety or that of others was in danger. *Id.* at 685, 542 *A.*2d 912. That reasonableness is to be measured by an objective standard. More than subjective impressions are required. *Ibid.*

"[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* at 679, 542 *A.*2d 912 (quoting *Terry, supra,* 392 *U.S.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909). We there noted the various circumstances that may give rise to an objectively reasonable suspicion that a suspect is armed and dangerous. In some instances the right to conduct a protective search flows directly from the basis for the investigatory stop. We quoted Justice Harlan in his concurring opinion in *Terry,* who stated that "the right to frisk must

be immediate and automatic if the reason for the stop is, as here, an articulable suspicion of a crime of violence." *Id.* 110 *N.J.* at 680, 542 *A.*2d 912 (quoting *Terry, supra,* 392 *U.S.* at 33, 88 *S.Ct.* at 1886, 20 *L.Ed.*2d at 913). In addition,

> courts are more likely to approve of "automatic" protective searches when officers, before they even approach the suspect, have a specific and objectively credible reason to believe the suspect is armed. *See Adams v. Williams,* 407 *U.S.* 143 [92 *S.Ct.* 1921], 32 *L.Ed.*2d 612 (1972) (upholding protective search based on an informant's tip that suspect seated in car was carrying narcotics and had "a gun at his waist."). [*Ibid.*]

*See also State ex rel. H.B., supra,* 75 *N.J.* 243, 381 *A.*2d 759 (upholding frisk based on anonymous tip concerning armed black man at luncheonette in black hat, black leather coat, and checkered pants when defendant precisely fit broadcast description).

In cases in which there is an insufficient basis for a protective search at the threshold of an encounter between an officer and a suspect, events occurring subsequent to a permissible investigatory stop may give rise to an objectively credible suspicion that the suspect is armed. Thus, in *Pennsylvania v. Mimms, supra,* 434 *U.S.* 106, 98 *S.Ct.* 330, 54 *L.Ed.*2d 331, when the police officers had stopped the automobile to issue the driver a traffic summons, as a matter of routine they requested him to step out. As the driver did so the officers observed a large bulge under his jacket, permitting the police to conclude that the driver was armed and thus posed a serious and present danger to their safety. Finally, there might be circumstances in which furtive movement and nervous appearance would establish the basis for a protective search. *See United States v. Oates,* 560 *F.*2d 45, 62 (2d Cir.1977) (observing that "to 'substantial dealers in narcotics' firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia" (quoting *United States v. Wiener,* 534 *F.*2d 15, 18 (2d Cir.), *cert. denied,* 429 *U.S.* 820, 97 *S.Ct.* 66, 50 *L.Ed.*2d 80 (1976))).

Applying such principles to the facts of the *Thomas* case, we found that when the police had received detailed information

that a person was in the possession of illegal drugs, it would establish the basis for an investigatory stop. 110 *N.J.* at 683, 542 *A.*2d 912. Unlike the situation in *State ex rel. H.B.*, *supra*, 75 *N.J.* 243, 381 *A.*2d 759, we concluded, however, that the suspicion of engaging in narcotics activity did not by itself establish that the defendant was "suspected of the violent criminal activity that would justify an 'automatic' search." *Thomas, supra,* 110 *N.J.* at 684, 542 *A.*2d 912 (quoting *Terry, supra,* 392 *U.S.* at 33, 88 *S.Ct.* at 1886, 20 *L.Ed.*2d at 913 (Harlan, J., concurring)). There had been no indication that the defendant was armed. We thus ruled that the record did not establish a particularized basis for an objectively reasonable belief that the defendant was armed and dangerous. *Id.* 110 *N.J.* at 685, 542 *A.*2d 912.

■ There is evidence in this case that the suspects appeared nervous. Nervousness and furtive gestures may, in conjunction with other objective facts, justify a *Terry* search, but ordinarily "[m]ere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity." *State v. Schlosser,* 774 *P.*2d 1132, 1137 (Utah 1989); *see Spence v. State,* 525 *So.*2d 442 (Fla.Dist.Ct. App.1988) (leaning down as if putting something on floor did not justify officer's suspicion of criminal activity); *People v. Mills,* 115 *Ill.App.*3d 809, 71 *Ill.Dec.* 247, 450 *N.E.*2d 935 (1983) (defendant's moving fast and leaning forward as officer approached did not create reasonable suspicion justifying even a stop); *People v. Superior Court of Yolo County,* 3 *Cal.*3d 807, 91 *Cal.Rptr.* 729, 478 *P.*2d 449 (1970) (passenger's putting her arm over the back seat, then facing forward and bending down, then resuming normal position did not support probable cause to search).

The Utah Supreme Court has reasoned that "[w]hen confronted with a traffic stop, it is not uncommon for drivers and passengers alike to be nervous and excited and to turn to look at an approaching police officer." *State v. Schlosser, supra,*

774 *P.*2d at 1138 (citing *State v. Mendoza,* 748 *P.*2d 181, 184 (Utah 1987)). Nervousness may mean something when combined with the discovery of drugs. *See State v. Palacio,* 111 *N.J.* 543, 545 *A.*2d 764 (1988). But as the dissent in *Palacio* points out, "[t]hat defendant appeared nervous while the police searched the car proves little more than that the presence of police officers tends to make most people somewhat apprehensive." *Id.* at 558, 545 *A.*2d 764 (Stein, J., dissenting). Here, as in the Utah case, the officers did not point to anything that made the circumstances unusual or suspicious other than the facts that the registration was not in the rented car and the driver spoke haltingly and glanced backward.

Obviously there are some cases in which "furtive" movements or gestures by a motorist, accompanied by other circumstances, will ripen into a reasonable suspicion that the person may be armed and dangerous or probable cause to believe that the person possesses criminal contraband. Examples of such factors are additional evasive action, lying to the police, the presence of other incriminating information about the motorist or occupants of the car, the absence of identification, and even the lateness of the hour. *See* Annotation, "Search and Seizure: 'Furtive' Movement or Gesture As Justifying Police Search," 45 *A.L.R.*3d 581 (1972). On the basis of our precedents, we conclude that this record does not establish a specific particularized basis for an objectively reasonable belief that the defendants were armed and dangerous.

### IV

To sum up, we agree with the position of the Attorney General that the *Michigan v. Long* rule is sound and compelling precedent and should be followed to protect New Jersey's police community. We have applied the rule of that case, which incorporates the *Terry* protective-search principles, in the search of a car. In making this ruling, we have no doubt about the good faith of the officer on patrol. New Jersey, along with

the United States Supreme Court, has recognized that the good faith of police officers is civil justification for their conduct. *Kirk v. City of Newark*, 109 *N.J.* 173, 536 *A*.2d 229 (1988). We know how hard it is for an officer on patrol to make split-second decisions that have to be analyzed months, if not years, later on a constitutional dimension. This officer, despite having been shot during a prior motor-vehicle stop, was extremely candid and straightforward in his testimony. He made no claim of having smelled marijuana or having seen drug paraphernalia in the car or suspicious objects in plain view. Indeed, he did not claim that he feared he was in danger but rather only that he was taking steps to make sure he could not be threatened. And the assistant prosecutor, who argued the suppression motion, was equally candid, saying at one point to the court: "It's close. It's close."

To some extent, the complexity in this field of law is cause for concern in itself. Justice Potter Stewart exhorted us to state the determinative rules with greater precision:

> The exclusionary rule is * * * criticized for allowing criminals to go free because of a "technicality"—because a police officer failed to comply with what are sometimes described as "hypertechnical" rules. * * * [W]e who have served as Justices of the Supreme Court must take our share of the blame. The fourth amendment is no "technicality." The occupation of a judge requires application of its sweeping language to cases presenting the infinite variety of factual situations that arise in real life. The art of being a judge, if there is such an art, is in announcing clear rules in the context of these infinitely varied cases, rules that can be understood and observed by conscientious government officials. If the outcome of fourth amendment cases has come to be regarded as turning on "technicalities," it is in part because of the inevitable human shortcomings of judges faced with the task of articulating fourth amendment principles applicable in a broad range of situations while doing justice in a particular case. Most judges do their best, but that is not always good enough. [Stewart, "The Road to *Mapp v. Ohio* and Beyond," 83 *Colum.L.Rev.* 1365, 1393 (1983).]

Three recent Appellate Division cases illustrate the problem of line-drawing in this area. In *State v. Lipski*, 238 *N.J.Super.* 100, 569 *A*.2d 272 (1990), the court invalidated a protective search based on routine procedure with no articulable suspicion that the driver was armed or dangerous. The court in *State v.*

*Letman,* 235 *N.J.Super.* 337, 562 *A.*2d 260 (1989), held that the flashlight sweep of the interior of a stopped vehicle, exposing in plain view a clear plastic bag filled with a white powder, warranted invocation of the automobile exception. In *State v. Carter,* 235 *N.J.Super.* 232, 561 *A.*2d 1196, *appeal denied,* (1989), the court held that observation of a passenger's "furtive movement," *id.* at 240, 561 *A.*2d 1196, reaching underneath the front seat, would sustain a *Terry*-type search of the car after the four occupants had left the vehicle. Each case involved varied strands of fourth amendment doctrine applied by conscientious government officials. But the common theme remains the development of objective principles of decision.

Those principles were recently restated by the United States Supreme Court. It said that "[i]n a sense *Long* authorized a "frisk" of an automobile for weapons." *Maryland v. Buie,* —— *U.S.* ——, 110 *S.Ct.* 1093, 108 *L.Ed.*2d 276 (1990). Such a frisk or "protective sweep" is justified only on the basis of "specific and articulable facts" and not on an "inchoate and unparticularized suspicion or hunch * * * that [the officer] is dealing with an armed and dangerous individual." *Id.* at ——, 110 *S.Ct.* at 1097, 108 *L.Ed.*2d at 284–285 (quoting *Terry, supra,* 392 *U.S.* at 21 & 27, 88 *S.Ct.* at 1879 & 1883, 20 *L.Ed.*2d at 906 & 909). This record falls short of that standard.

We wish that we could do more, but Justice White has reminded us too that there is no "litmus-paper test * * * for determining when a seizure exceeds the bounds of an investigative stop" and that "it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment. Nevertheless, we must render judgment * * *." *Florida v. Royer,* 460 *U.S.* 491, 506–07, 103 *S.Ct.* 1319, 1329, 75 *L.Ed.*2d 229, 242 (1983).

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division for further proceedings.

POLLOCK, J., concurring.

The Court declares invalid under federal law a warrantless automobile search conducted under circumstances where the police did not have "a specific particularized basis for an objectively reasonable belief that the defendants were armed and dangerous." *Ante* at 48, 573 *A.*2d at 48. In reaching that result, the Court summarizes the testimony of the investigating officer:

> He made no claim of having smelled marijuana or having seen drug paraphernalia in the car or suspicious objects in plain view. Indeed, he did not claim that he feared he was in danger but rather only that he was taking steps to make sure he could not be threatened. And the assistant prosecutor, who argued the suppression motion, was equally candid, saying at one point to the court: "It's close. It's close."

Looking at the same facts and applying the same test, the dissent concludes that the search was necessary "to protect the safety of the state trooper." *Post* at 55, 573 *A.*2d at 1387. The conflict between the results of the majority and dissenting opinions points up the fact-sensitive nature of search-and-seizure cases. It also illustrates the unavoidable uncertainty of relying solely on federal law to resolve those cases. Given the number of automobile searches that occur regularly in New Jersey, the issue is important not only for suspects, the police, and the public, but also for the administration of justice.

On the facts of this case, I believe that the Court is correct. Consequently, I join in its opinion, subject to the following reservations. I write separately because the Court's opinion studiously avoids New Jersey law as an independent basis for its holding.

Just five years ago, in another search-and-seizure case, the United States Supreme Court reversed a judgment of this Court not because we had employed the wrong standard, but because we had misapplied it. *New Jersey v. T.L.O.*, 469 *U.S.* 325, 105 *S.Ct.* 733, 83 *L.Ed.*2d 720 (1985). In *T.L.O.*, the High Court expressly acknowledged the substantial similarity between its test, "reasonableness, under all the circumstances," and the one

we adopted, "reasonable grounds." *Id.* at 343, 105 *S.Ct.* at 743–44, 83 *L.Ed.*2d at 736. The reversal resulted solely from the Court's perception that our opinion "reflect[ed] a somewhat crabbed notion of reasonableness." *Ibid.*, 469 *U.S.* at 344, 105 *S.Ct.* at 744, 83 *L.Ed.*2d at 736.

On matters of federal law, we owe allegiance and respect to the interpretations of the United States Supreme Court. Hence, in this case, as in all others, we are bound by its opinions on federal law. On matters of state law, however, we are obliged to provide our own interpretations. In *T.L.O.*, as in the present case, we have failed to fulfill that obligation.

Here, defendants rely not only on the fourth amendment to the United States Constitution, but also on article 1, paragraph 7 of the New Jersey Constitution. Like its federal counterpart, that article of the State Constitution prohibits unreasonable searches and seizures. I believe the Court should address both parts of defendants' argument. The failure to analyze defendants' state-law argument may require us to review that argument in the future if the United States Supreme Court should agree that the dissent, not the Court, has correctly applied federal law.

As Justice Clifford wrote in *State v. Hartley,*

[w]e would be remiss were we to rest our decision exclusively on federal grounds when alternative state grounds exist. Failure to set forth clearly the independent state-law basis for a decision in a case in which federal constitutional law is also involved can lead to needless review in the United States Supreme Court, and could in fact require in some cases, subsequent redundant proceedings in our own courts. Such a disregard for concerns of judicial economy has been criticized. [103 *N.J.* 252, 285–86, 511 *A.*2d 80 (1983) (citation omitted).]

Under our federalist system, a state-law analysis manifests no disrespect for federal courts as partners in protecting fundamental rights. The United States Supreme Court, charged as it is with establishing a basic level of protection for the entire nation, often is obliged to establish a lowest common denominator of such protection. The federalist system contemplates that state courts may grant greater protection to fundamental

rights than is accorded under the federal constitution. When a state supreme court grants such protection, it does no more than fulfill its obligation to uphold its own constitution.

As Justice Stein pointed out in *State v. Novembrino,*

It is an established principle of our federalist system that state constitutions may be a source of "individual liberties more expansive than those conferred by the Federal Constitution."

This Court has frequently resorted to our own State Constitution in order to afford our citizens broader protection of certain personal rights than that afforded by analogous or identical provisions of the federal Constitution. Although the language of article 1, paragraph 7 of the New Jersey Constitution is virtually identical with that of the fourth amendment, we have held in other contexts that it affords our citizens greater protection against unreasonable searches and seizures than does the fourth amendment. [105 *N.J.* 95, 144–45, 519 *A.*2d 820 (1987) (citations omitted).]

When protection under the State Constitution is clear and protection under the federal constitution is not, we may properly rely on the State charter to remedy the rights violation. "Compelled by principles of sound jurisprudence," *Hartley, supra,* 103 *N.J.* at 284, 511 *A.*2d 80, we also rely on the State Constitution when confronted with issues not yet directly addressed by the United States Supreme Court. As explained in *Hartley,* the practice of relying on state law grounds is prudent even when we believe that the result is mandated by the federal constitution. *Id.* at 284–85, 511 *A.*2d 80. In the face of even a small doubt whether our decision correctly interprets federal law, we have a duty of providing guidance to state law-enforcement officials to settle the issue as a matter of state law. *Id.* at 285, 511 *A.*2d 80.

The present case is an appropriate example of one in which the Court should base its decision on both state and federal law. As a matter of federal law, the issue is controlled by *Michigan v. Long,* 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201 (1983). In *Long,* the High Court held that police may conduct a "protective search" of the interior of a stopped automobile, "as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Id.* at 1051, 103 *S.Ct.* at 3482, 77 *L.Ed.*2d at 1221.

The problem, as the difference between the majority and dissenting opinions in the present case illustrates, is in determining whether arresting officers possessed such a belief. Even the prosecutor who opposed the motion to suppress in the trial court admitted that this case presents a "close call."

Ironically, the case that is at the heart of today's decision, *Long, supra,* is the leading decision for the proposition that a state court must make a plain statement that it is relying on state law as an independent ground for its decision. The failure of the Michigan Supreme Court in *Long* to make such a statement led in that case to a reversal and remand to that court.

In the present case, the Court assiduously follows one lesson from *Michigan v. Long,* that requiring that officers possess an objectively reasonable belief that defendants were armed and dangerous, and just as assiduously ignores the plain-statement requirement. By ignoring the second lesson, the Court repeats the error that *Long* sought to remedy.

In sum, important considerations compel reliance on state law as an independent basis for our decisions. Those considerations include the fact-sensitive nature of search-and-seizure cases, the different roles of state and federal courts in our federalist system, the need of law-enforcement officers for certainty, and our obligation to fairly and justly administer our Court system. I conclude that the Court would be well-advised to supplement its analysis of federal law with an independent analysis of the prohibition against unreasonable searches and seizures under the New Jersey Constitution.

Justice CLIFFORD joins in this opinion.

GARIBALDI, J., dissenting.

I would affirm the Appellate Division and trial court that the evidence of cocaine should not be suppressed because the State Trooper's conduct falls within the law established under *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968), and

*Michigan v. Long*, 463 *U.S.* 1032, 103 *S.Ct.* 3469, 77 *L.Ed.*2d 1201 (1983), as a limited search to protect the safety of the State Trooper.

In *Terry v. Ohio*, a police officer observing unusual conduct of defendant and two other men, and concluding that the men were contemplating a daylight robbery, stopped and frisked them thereby discovering guns. The Court denied defendant's motion to suppress the revolver seized from him. The Supreme Court held that a police officer could stop and frisk someone who he suspected might be about to commit a crime without probable cause or a warrant. This stop and frisk was sustained because it was no more than a "protective ... search for weapons." 392 *U.S.* 1, 29, 88 *S.Ct.* 1868, 1884, 20 *L.Ed.*2d 889, 910; *see Chimel v. California*, 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.*2d 685 (1969).

In *Terry*, the Court found that:

[T]here is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search [or seizure] entails. *Camara v. Municipal Court*, 387 *U.S.* 523, 534–535, 536–537, 87 *S.Ct.* 1727, [1733–1734, 1734–1735] 18 *L.Ed.*2d 930 (1967). And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. [392 *U.S.* 1, 21, 88 *S.Ct.* 1868, 1879, 20 *L.Ed.*2d 889, 905 (1968) (footnote omitted).]

The Court found in the *Terry* fact situation that the officer's conduct was reasonable when weighed against the legitimate interest in "crime prevention and detection," *id.* at 22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906, and the "need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack possible cause for an arrest." *Id.* at 24, 88 *S.Ct.* at 1881, 20 *L.Ed.*2d at 907–08. Thus, the Court concluded that if a police officer reasonably believed

that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to

neutralize the threat of physical harm. [*Ibid.; 392 U.S.* at 25, 88 *S.Ct.* at 1882, 20 *L.Ed.*2d at 908].

After *Terry,* the Supreme Court extended the stop and frisk doctrine to include vehicle stops in *Pennsylvania v. Mimms,* 434 *U.S.* 106, 98 *S.Ct.* 330, 54 *L.Ed.*2d 331 (1977). In that case, a police officer pulled over defendant's automobile to issue a traffic summons for an expired license plate. The officer asked defendant to step out of the car, at which time the officer noticed a large bulge under defendant's sports jacket. Fearing that the bulge might be a weapon, the officer frisked defendant and discovered a .38–caliber revolver.

The Supreme Court first addressed the question whether "the order to get out of the car, issued after the driver was lawfully detained, was reasonable and thus permissible under the Fourth Amendment." *Id.* at 109, 98 *S.Ct.* at 332, 54 *L.Ed.*2d at 336. The State argued that the practice of asking the driver to exit the vehicle was adopted to protect the officer since a face-to-face confrontation reduces the likelihood of an assault on the police officer. *Id.* at 110, 98 *S.Ct.* at 333, 54 *L.Ed.*2d at 336. The Court agreed with this reasoning by stating:

> We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. "According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J.Crim.LC & PS 93 (1963)—" *Adams v. Williams,* 407 *U.S.* 143, 148 n. 3, 32 *L.Ed.*2d 612, 92 *S.Ct.* 1921 [1924 n. 3] (1972). We are aware that not all these assaults occur when issuing traffic summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. Indeed, it appears "that a significant percentage of murders of police officers occurs when the officers are making traffic stops." [*Id.* at 110, 98 *S.Ct.* at 333, 54 *L.Ed.*2d at 336–70 (citations omitted).]

Thus, the Court held that the additional intrusion to the driver of the car was "de minimus," and so police officers may require a driver to exit his car when the motor vehicle has been

lawfully detained. *Id.* at 111, 98 *S.Ct.* at 333, 54 *L.Ed.*2d at 337. Finally, the Court concluded that once the driver was outside the car, the officer could "stop and frisk" him as a protective search controlled by *Terry v. Ohio, id.* at 111–12, 98 *S.Ct.* at 333–34, 54 *L.Ed.*2d at 337–38.

After *Pennsylvania v. Mimms,* the Supreme Court decided *Michigan v. Long,* which I agree with the majority is controlling in this case. In *Michigan v. Long,* two police officers observed a car traveling erratically and at excessive speed. When the car swerved into a ditch, the officers stopped to investigate and were met by the driver at the rear of the car. The driver "appeared to be under the influence of something" and did not respond to initial request to produce his license and registration. Then, the driver began walking toward the open door of the car, apparently to obtain the registration, and the officers followed him. At this time, the officers saw a hunting knife on the floorboard of the driver's side of the car. The officers stopped the driver and subjected him to a *Terry* search, which revealed no weapon. One officer then shined his flashlight into the interior of the vehicle "to search for other weapons." The officer noticed something under the arm rest on the front seat and entered the vehicle to investigate it. He then saw an open pouch on the front seat and determined that it contained what appeared to be marijuana. The driver was then arrested for possession of marijuana. 463 *U.S.* at 1035–36, 103 *S.Ct.* at 3473–74, 77 *L.Ed.*2d at 1211.

The Supreme Court concluded:

Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons. See *Terry,* 392 *U.S.,* at 21, 20 *L.Ed.*2d

889, 88 *S.Ct.* 1868, 44 Ohio Ops 2d 383. "(T)he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.,* at 27, 20 *L.Ed.*2d 889, 88 *S.Ct.* 1868, 44 Ohio Ops 2d 383. [*Michigan v. Long, supra,* 463 *U.S.* at 1049–50, 103 *S.Ct.* at 3480–81, 77 *L.Ed.*2d at 1219–20].

Applying this analysis of the law to the specific facts in *Michigan v. Long,* the Court found the search was justified. Additionally, the Court rejected the argument that Long was under police control and could not gain access to weapons in the car:

During any investigative detention, the suspect is "in the control" of the officers in the sense that he "may be briefly detained against his will...." *Terry, supra,* at 34, 20 *L.Ed.*2d 889, 88 *S.Ct.* 1868, 44 Ohio Ops 2d 383 (White, J., concurring). Just as a Terry suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a Terry suspect in Long's position break away from police control and retrieve a weapon from his automobile. See *United States v. Rainone,* 586 *F.*2d 1132, 1134 (CA7 1978), cert. denied, 440 *U.S.* 980, 60 *L.Ed.*2d 239, 99 *S.Ct.* 1787 (1979). In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside. *United States v. Powless,* 546 *F.*2d 792, 795–796 (CA8), cert. denied, 430 *U.S.* 910, 51 *L.Ed.*2d 588, 97 *S.Ct.* 1185 (1977). Or, as here, the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons. In any event, we stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation "at close range," *Terry,* 392 *U.S.* at 24, 88 *S.Ct.* at 1881, when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger...." *Id.,* at 28, 88 *S.Ct.* at 1883. In such circumstances, we have not required that officers adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter. [*Id.* 463 *U.S.* at 1051–1052, 103 *S.Ct.* at 3481–82, 77 *L.Ed.*2d at 1221–1222 footnote omitted.]

We have long recognized that the dangers facing police officers in making traffic stops are real and continuing. Indeed, the majority starts its opinion with a statement from the Attorney General's brief that one study shows that of state police officers killed nationwide in the line of duty for a six year period, from 1976 to 1982, "40% of the troopers killed by gunfire were fatally wounded while making traffic stops." The Attorney General also cites two recent New Jersey roadside encounters between suspects and police that have proved fatal,

*State v. Thomas William Manning,* App.Div. Docket No. A–3460–86T5, and *State v. Dougals Parsons,* App.Div. Docket No. A–83–85T4). There are undoubtedly other such cases. Indeed, the state trooper in this case was previously wounded in a routine motor stop.

Of course, in determining whether the search is constitutional, we balance the safety of law-enforcement officers against privacy interest in one's car and its contents, and the intrusion of the search. In general, the Supreme Court has found that the fourth amendment does protect automobile searches but that the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. As the Supreme Court recently stated:

> While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police. [*New York v. Class,* 475 *U.S.* at 114–15, 106 *S.Ct.* at 965, 87 *L.Ed.*2d at 91].

*See Delaware v. Prouse,* 440 *U.S.* 648, 662–63, 99 *S.Ct.* 1391, 1400–01, 59 *L.Ed.*2d 660, 673 (1979).

This lesser expectation of privacy for a vehicle has been based on several reasons. An automobile is used for transportation. It has little capacity of escaping public scrutiny. It is a normal occurrences for police officers to stop and examine cars for all sorts of motor vehicle infractions. Moreover, as a practical matter the inherent mobility of a car creates exigent circumstances that the defendant and the evidence may disappear. Thus, the Supreme Court has concluded that an individual has less privacy from government intrusion in a car than in his or her house, and so the government needs a lesser justification to have a valid warrantless search of a vehicle. Moreover, the Supreme Court in *Pennsylvania v. Mimms* found the "intrusion into the driver's personal liberty ... by the order to get out of the car" to be "de minimis." 434 *U.S.* at 111, 98 *S.Ct.* at 333, 54 *L.Ed.*2d at 337.

The majority recognizes that *Terry v. Ohio* and *Michigan v. Long* control this case. It likewise recognizes the continued and real danger to police officers who make traffic stops. It laments the intricacies and technicalities of the law in this area and the difficulties cops have in the real world in determining whether they are in danger. Nonetheless, it decides, on these facts, that the state trooper in this case did not have reason to fear that the defendants had a hidden weapon in their car.

I disagree and find that the totality of the circumstances compels the conclusion that the state trooper acted as a reasonably prudent police officer for his protection in his limited search of the car. My reasons are best expressed by the trial court in its oral opinion:

> The totality of the circumstances here are there are already two motor vehicle violations, the driver is observed reaching into the rear seat, the occupants are at least in that opinion of the officer, unusually nervous. There are repeated furtive looks to the rear of the car, the windows have been—have had something applied that conceals the interior of the car, this is a garment on the back seat, the driver does not produce a valid registration for the vehicle. Let the record reflect that it's a cotton windbreaker stuffed in the crack of the seat. What did the officer do? The officer asked the occupants to exit the vehicle and move to a position of safety, for both his safety and their safety. Do we reasonably expect an officer to search a vehicle with the occupants in it, I hardly think so, it's totally irrational. What kind of search did he conduct, did he break anything? No. Did he unlock anything? No. Was there a container? No. Did he dismantle anything or disassemble anything? No. He reached into a crack in the seat. What better place to hide a weapon, I wonder? The belief that can justify a protective search can arise to the level that would justify a patdown of the defendant's person, *Terry v. Ohio*. And need not constitute probable cause to search. The search must be limited to those areas of the passenger compartment in which a weapon may be placed or hidden. An obvious one, the crack in the seat.

Since the search was properly instituted, the state trooper conducting the search was not required to ignore any contraband other than weapons that he discovered. Therefore, I find that under the totality of these circumstances, the search made by the state trooper does not offend the constitution and was reasonable.

Accordingly, I would affirm the judgment of the Appellate Division.

Justices CLIFFORD and POLLOCK concurring in result.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*For affirmance*—Justice GARIBALDI—1.