624 A.2d 79

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. BRUCE DANIELS AND KAREEM DUDLEY,
DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 6, 1993—Decided April 30, 1993.

162

Before Judges MICHELS, BILDER and BAIME.

*Susan W. Sciacca*, Assistant Prosecutor, argued the cause for appellant (*John J. Fahy*, Bergen County Prosecutor, attorney; *Ms. Sciacca*, of counsel and on the letter brief).

*Robert L. Sloan,* Assistant Deputy Public Defender, argued the cause for respondent Bruce Daniels (*Zulima V. Farber,* Public Defender, attorney; *Mr. Sloan,* of counsel and on the brief).

*Linda Mehling,* Assistant Deputy Public Defender, argued the cause for respondent Kareem Dudley (*Zulima V. Farber,* Public Defender, attorney; *Ms. Mehling,* of counsel and on the brief).

The opinion of the court was delivered by

BILDER, J.A.D.

This is an appeal by the State from an order of the Law Division suppressing approximately 325 grams of cocaine seized in connection with a motor vehicle stop on the Garden State Parkway. The sole issue is whether the facts as they appeared to the State Trooper provided an objectively reasonable basis for an examination of the front seat of the car which disclosed the plain sight presence of the cocaine—*i.e.,* whether the officer had a right to enter the car to examine an area toward which he had seen the front seat passenger lean or move earlier in the stop. Following a suppression hearing, the trial judge concluded that the totality of the circumstances did not give rise to an objectively reasonable articulable reason to look into the front seat. We disagree.

The background factors as to the stop are relatively simple and apparently uncontested. Shortly after 9:00 p.m. on September 4, 1991, while conducting a traffic check at the Garden State Parkway's Shadowbrook toll plaza, Trooper Albert Rivera observed a four-door 1987 Audi without a front license plate or inspection sticker. When a view of its rear disclosed a New Jersey plate, Trooper Rivera pulled the car over. The trial judge properly found that the stop for the motor vehicle violations was lawful.

When signalled, the Audi pulled onto the shoulder but continued for some two-tenths of a mile before coming to a stop—a circum-

stance which to this experienced officer was unusual.[1]

When he approached the stopped vehicle, Rivera saw that it had three occupants, two of whom struck him as being particularly large.[2] When Rivera asked for credentials, the driver, defendant Bruce Daniels, gave him a valid driver's license but could not furnish any vehicle documentation. The front seat passenger, Jason McCoy, gave him an insurance card for a Ford.

Rivera then returned to his patrol car, called in the rear license plate and learned it belonged to a 1980 Ford. While this was taking place, Rivera noted McCoy reach down under his seat and then reach toward the center console.[3] At this point, Rivera feared for his safety and requested backup—which arrived within seconds.

Now accompanied by Trooper Maguire, Rivera returned to the Audi and asked the occupants to get out. Each were subjected to pat-down searches with negative results and told to sit on the hood of the Audi. Rivera asked McCoy about the movement he had observed and in response was told he, McCoy, didn't know what Rivera was talking about.

Rivera then entered the Audi and looked at the area where he had seen McCoy leaning or moving toward. He saw a paper bag, upright and open, whose contents—clear plastic bags containing white powder—were plainly visible. The occupants were arrested

---

[1] The officer, with five years experience, noted that the car initially moved onto the shoulder at mile post 159.9 but travelled south over 1,000 feet to mile post 159.7 before stopping.

[2] Rivera is 5 feet 11 inches and weighed about 180 pounds. He noted that the front seat passenger appeared to be 6 feet 4 or 5 inches tall and over 300 pounds. The driver appeared to be close to 200 pounds.

[3] In his decision, the trial judge noted that Rivera's initial description did not characterize McCoy's movement as "furtive". Although such characterizations may be helpful in understanding a police officer's subjective reactions, they are not talismanic, search justifying "sesames". The critical inquiry is to the objective nature of the movement and the place that act has in the overall totality of the circumstances confronting the officer.

and the suspected narcotics—later identified as same 325 grams of cocaine—were seized.

In viewing the totality of the circumstances, the trial judge characterized the basis of the Trooper's safety concerns as: the continuation of the vehicle to drive on the shoulder, the lack of vehicle credentials, McCoy's furtive movements and the fact it was dark and the troopers were outnumbered. His examination of these factors—which he described as elements concocted together—led him to conclude that they could not give rise to an objectively reasonable basis for a search of the interior of the Audi. He found the police were not outnumbered, the lack of vehicle credentials a very common experience which neither by itself nor in context could give rise to an articulable reason for a safety concern. He described the furtive movement as a cliche and minimized the Audi's continued travel on the shoulder for over 1,000 feet.

The Supreme Court has repeatedly enjoined us to recognize the realities of police work and the dangers inherent in the type of motor vehicle stop which the troopers were engaged in that September evening. *See State v. Lund,* 119 *N.J.* 35, 37, 573 *A.*2d 1376 (1990). Their conduct must be examined objectively from the perspective of a reasonable police officer in the particular circumstances. *Id.* at 45, 573 *A.*2d 1376; *State v. Bruzzese,* 94 *N.J.* 210, 219, 463 *A.*2d 320 (1983). Although a failure to stop promptly may seem unimportant to a layman, the continued travel for over 1,000 feet was apparently significant to this experienced police officer. While the weight to be given to that experience may be for a fact-finder, it is clearly entitled to some respect. It must, at the very least, be accepted as an unusual circumstance. Thereafter, the officer was confronted, not with a lack of vehicle documentation but, to the contrary, with suspicious documentation—a 1987 Audi with a plate from a 1980 Ford and a proffered insurance card for a Ford. This cannot be viewed as a commonly experienced lack of proper documentation but, rather, as circumstances which fairly create reasonable cause to believe that the

Audi might be a stolen vehicle. Rivera's concern for his own safety, far from being a post-haec concoction, was forcefully evidenced at the time by his request for assistance and the prudent pat-down searches of the occupants. *See Terry v. Ohio,* 392 *U.S.* 1, 27, 88 *S.Ct.* 1868, 1883, 20 *L.Ed.2d* 889, 909 (1968); *State v. Lund,* 119 *N.J. supra* 39, 573 *A.*2d 1376; *State v. Carter,* 235 *N.J.Super.* 232, 237, 561 *A.*2d 1196 (App.Div.1989). Confronted with a possible stolen car, it was reasonable for Rivera to have at least some concern as to why McCoy was reaching under the seat or reaching toward the center console. Faced with McCoy's failure to explain the movement, a failure to investigate the area would have been foolhardy.

The reliance of the trial judge and the defendants on *State v. Lund, supra* is misplaced. As Justice O'Hern took pains to note, "the touchstone of decision obviously will be found on the facts of each case." *Id.* 119 *N.J.* at 43, 573 *A.*2d 1376. "[E]vents occurring subsequent to a permissible investigatory stop may give rise to an objectively credible suspicion that the suspect is armed." *Id.* at 46, 573 *A.*2d 1376. "[T]here might be circumstances in which furtive movement and nervous appearance would establish the basis for a protective search." *Ibid.* In sum, *Lund* recognized that this is a very fact-sensitive area in which one must objectively look to the totality of the circumstances to determine whether a reasonably prudent man in those circumstances would be warranted in the belief that his safety or that of others was in danger. *Id.* at 39, 573 *A.*2d 1376.

> Obviously there are some cases in which "furtive" movements or gestures by a motorist, accompanied by other circumstances, will ripen into a reasonable suspicion that the person may be armed and dangerous or probable cause to believe that the person possesses criminal contraband. Examples of such factors are additional evasive action, lying to the police, the presence of other incriminating information about the motorist or occupants of the car, the absence of identification, and even the lateness of the hour. *Id.* at 48, 573 *A.*2d 1376.

In *Lund,* there was at most a furtive movement and the officer's perception of nervousness. When the driver stopped, he turned and reached toward the back seat. When motor vehicle credentials were requested, the driver produced a driver's license

and a car rental agreement. The trooper noted that the driver was nervous and that a cotton windbreaker was stuffed in the corner of the back seat in the area to which the driver had turned. The Supreme Court concluded that these facts did not establish a specific particularized basis for an objectively reasonable belief that the occupants of the car posed a threat to the officer's safety. We understand *Lund* to say no more than that nervousness and furtive gestures alone ordinarily do not justify a *Terry*[4] search. *Id.* at 47–48, 573 *A.*2d 1376.

The instant case presents a far different situation. Confronted with a lack of documentation and a falsely plated car, the troopers had an objectively reasonable basis to fear they were dealing with a stolen car. Concerns engendered by the movements of the front seat passenger reaching under his seat or toward the center console became heightened by his denial of those actions. And all of this took place in the context of the unusual manner in which the driver continued along the shoulder for an additional two-tenths of a mile from the toll plaza before stopping, at night with two passengers. These facts bespeak more the kinds of conduct which Justice O'Hern said could ripen into a reasonable concern for safety, *id.* at 48, 573 *A.*2d 1376, than the lack of suspicious conduct in *Lund* which required that the seizure be suppressed.

Reversed. The order of suppression is vacated and the matter is remanded for trial.

---

[4] *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968).