754 A.2d 567 (2000)
333 N.J. Super. 19
STATE of New Jersey, Plaintiff-Respondent,
v.
Carl HAMPTON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 2000.
Decided July 13, 2000.
*569 Frank J. Pugliese, Assistant Deputy Public Defender, for defendant-appellant (Ivelisse Torres, Public Defender, attorney; Mr. Pugliese, of counsel and on the brief).
Bennett Barlyn, Deputy Attorney General, for plaintiff-respondent (John J. Farmer, Jr., Attorney General, attorney; Mr. Barlyn, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges STERN, KESTIN and WEFING.
*568 The opinion of the court was delivered by STERN, P.J.A.D.
Defendant was convicted of possession of heroin (count two) and possession of heroin with intent to distribute (count one). Count two was merged into count one, and defendant was sentenced to an extended term of nine years in the custody of the Commissioner of Corrections, with three years before parole eligibility. On this appeal, defendant argues:
POINT I THE STATE TROOPER IN THIS CASE COULD NOT ARTICULATE ANY CIRCUMSTANCES OF THE MOTOR VEHICLE STOP THAT LED TO HIS DECISION TO REQUEST CONSENT FOR A SEARCH OF THE ENTIRE VEHICLE. HIS OVERALL TESTIMONY WAS INCREDIBLE, MAKING IT JUST AS LIKELY THAT DEFENDANTS WERE SINGLED OUT FOR A CONSENT SEARCH BECAUSE THEY ARE AFRICAN-AMERICANS. THIS CONSTITUTES A VIOLATION OF STATE POLICE RULES AND PROCEDURES AND VIOLATED DEFENDANTS' STATE AND FEDERAL RIGHT AGAINST UNREASONABLE SEARCHES AND SEIZURES, THEIR RIGHT TO DUE PROCESS, AND THEIR RIGHT TO EQUAL PROTECTION OF THE LAW. (U.S. CONST., AMENDS IV AND XIV; N.J. CONST. (1947), ART. I, PARAS. 1, 7.) (Partially Raised Below)
A) Judge John Conte's Credibility Finding Was Wrong Given That It Was Based Upon Nothing More Than The Trooper's Naked Assertions.
B) Defendant's Rights To Due Process And Equal Protection Were Infringed.
POINT II THE TRIAL JUDGE ERRED IN FAILING TO SUPPRESS THE EVIDENCE AS THE DEFENDANTS WERE ILLEGALLY DETAINED PRIOR TO THE DISCOVERY OF THE DRUGS
POINT III SUPPRESSION OF THE EVIDENCE SHOULD HAVE BEEN GRANTED BECAUSE THE SEARCH WAS CONDUCTED WITHOUT REGARD TO THE CONDITIONS UNDER WHICH IT WAS AUTHORIZED. (Not Raised Below)
POINT IV THE PROSECUTOR'S SUMMATION EXCEEDED THE BOUNDS OF PROPRIETY AND DEPRIVED THE DEFENDANTS OF A FAIR TRIAL. (U.S. CONST. AMENDS. VI AND XIV; N.J. CONST. (1947), ART. I, PAR. 10.[) ] (Not Raised Below)
POINT V THE SENTENCING JUDGE IMPROPERLY CONSIDERED *570 AND WEIGHED THE AGGRAVATING AND MITIGATING FACTORS AGAINST DEFENDANT.
POINT VI THE D.E.D.R. PENALTY AND LAB FEE AS IMPOSED AT SENTENCING ARE ERRONEOUS AND MUST BE MODIFIED.
In his pro se supplemental brief, defendant also argues:
THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUP[P]RESS[.] AS A RESULT THE APPELLANT WAS PREJUDICED BY THE COURT'S RULING
NEW JERSEY STATE TROOPER MICHAEL DAVIS CONDUCTED[] AN UNCONSTITUTIONAL PROFILE ARREST AND VIOLATED APPELLANT'S FOURTH AND EIGHTH AMENDMENT [SIC] TO THE UNITED STATES CONSTITUTION AND NEW JERSEY'S STATE CONSTITUTION
APPELLANT IS ENTITLED TO DISMISSAL OF THE INDICTMENT FOR THE STATE'S FAILURE TO COMPLY WITH THE INTERSTATE AGREEMENT OF DETAINERS ARTICLE III, IV(C) AND WHETHER THE APPELLANT IS ENTITLED TO JAIL CREDIT OR REDUCTION IN SENTENCE
THE TRIAL COURT COMMITTED REVERSIBLE ERROR, PLAIN ERROR, WHEN IT FAILED TO INSTRUCT THE JURY WITH RESPECT THAT THE STATE NEED NOT "PROVE DEFENDANT'S KNOWLEDGE OF THE QUANTITY OF DRUGS, AND THE TRIAL COURT ERRED IN FAILING TO ADEQUATELY EXPLAIN THE ESSENTIAL PART OF THE DEFINITION OF CONSTRUCTIVE POSSESSION, MERE PRESENCE"
THE APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AT THE PRE-TRIAL AND SENTENCING STAGE OF HIS CRIMINAL PROCEEDING
By supplementary applications, defendant, through counsel, seeks to expand the record and seeks reconsideration of his motion to suppress in light of the "Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling" and caselaw decided after the Interim Report was published. Given our disposition, we do not address whether a defendant can raise a claim of selective enforcement of the laws, or seek discovery incident thereto, for the first time on appeal.
The only witness at the suppression hearing was New Jersey State Trooper Michael Davis.[1] He was patrolling Interstate 80 in Saddle Brook on April 15, 1989, at approximately 3:15 p.m. At that time he stopped the 1984 Pontiac in which defendant was a passenger. The car, which had Ohio license plates, was traveling westbound at 67 miles per hour in a 55 mile-per-hour zone, and was being driven by codefendant Gregory Melton.
The trooper testified that after he stopped the car, Melton produced his license and registration upon request, and the documents did not give rise to any suspicion or concern. After looking at the credentials and looking into the car, Davis said he had no reason to believe that there was contraband in the vehicle.[2]
Trooper Davis could not provide specifics of his conversation with the driver and passenger, but recalled asking them questions about where Melton and defendant were coming from and going. Davis said he was not concerned for his safety, but asked the passenger the same questions as the driver because he "wanted to confirm, you know, what was said by the driver." "[I]t was just part of trying to see if I need *571 to take this case a little further, or the stop a little further." The trooper said he thought he needed to go further because the two "seemed unnaturally nervous," gave conflicting stories, and the trooper did not see luggage in the car, which he thought was "strange," as they said they were traveling between Ohio and New York.[3]
The trooper then presented Melton with a "Consent to Search" form and asked him to sign it so the trooper could search the car. Melton signed the form at 3:35 p.m., and the trooper searched the interior of the vehicle but found nothing. In fact, Davis said he did not find anything that gave him any reason to believe "there were any unlawful items in the car." He nevertheless asked Melton for a key so he could look in the glove compartment and the trunk, but both Melton and defendant said there was no key. The trooper said he thought it "was real strange" that the men would "drive this far without a key to the trunk," particularly because they might get a flat tire. As a result, Davis advised the two men of their Miranda rights and told them he "would be taking them back to the station for a further search."
While the trooper claimed the two men were not under arrest when their rights were read, he also testified "I was placing [them] under arrest." Although acknowledging that he had no "reasonable suspicion" to believe that defendant "committed a criminal offense," Davis took both men to the State Police barracks in Totowa, which was about eight to ten miles away, so he could conduct "a further search of the vehicle."
Once at the barracks, Trooper Davis had the defendants' car taken to the garage "[j]ust to do a more thorough search for my safety." Defendant and Melton were not handcuffed, but were seated in the squad room while the trooper searched their vehicle in the garage outside their presence. During his search, Davis "found an electric switch" underneath the dashboard that popped open the car's trunk. Thereafter, he searched the trunk outside the presence of both defendant and Melton.
Davis testified that it took ten to fifteen minutes to drive to the Totowa barracks and another ten minutes to find the activation switch for the trunk, totaling more than twenty-five minutes after leaving the area of the stop, before he found the trunk's activation switch. Although the "Consent to Search" form did not give consent to search at a remote time or location, or on multiple occasions, Davis said he was searching the vehicle under the theory that the consent allowed him to "find the trunk lock and pop the trunk." Davis admitted that he could have looked for the trunk switch at the scene of the stop, but he elected not to do so.
Upon opening the trunk, the trooper found a tan briefcase inside, but said he had no reason "to think that there was contraband in [the] briefcase." Nonetheless, Davis took the briefcase to where defendant and Melton were sitting. As a result of his conversation with the men, Davis "got the impression that neither one of them owned it or ever saw it before." As a result, Davis became "suspicious" because the briefcase was "locked, and no one knew who it belonged to."
Davis therefore called for a drug-sniffing "narco dog." The dog "react[ed] positive" to the briefcase, indicating that it contained drugs, so Davis "pried open the briefcase." Inside the briefcase he found envelopes containing 229 decks of heroin and personal papers belonging to defendant. After showing defendant what *572 the trooper found in the briefcase, the trooper said defendant "started giving statements, saying that the articles belonged to him."
The motion judge denied defendant's motion to suppress. He found the search was a valid consent search, and that the trooper was justified in bringing the vehicle back to the barracks and searching the trunk there because he had a valid consent to search the vehicle. He also found that when both men claimed the briefcase did not belong to them, that the trooper was "in [his] rights to open up the case and to see what was in it." Finally, the judge concluded that:
[T]here was probable cause to stop the vehicle. The trooper had suspicions; he asked for a consent to search the parties; the driver signed the consent to search. The result of the search was 229 decks of heroin. There's nothing improper or unreasonable. It's a reasonable, articulated suspicion for the search, and the result, the bottom line is, is that he was right. He found the narcotics, the heroin.
Defendant argues that the detention and search of the automobile in which defendant was a passenger violated his rights under the Fourth Amendment of the United States Constitution and under Article I, paragraph 7 of the New Jersey Constitution. Even accepting the judge's findings that Trooper Davis was credible, State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964), we reverse the denial of defendant's motion to suppress.
We hold, under the unique facts involved, that defendant and his co-defendant were detained for an unreasonable length of time, and that the search exceeded the scope for which it was authorized because it was conducted outside the presence of the person consenting to the search and, in any event, at a remote time and location. In essence, the consent did not authorize the detention that occurred in this case.
As already noted, co-defendant Melton executed a "Consent to Search" form after the car was stopped on Route 80. The form was signed at 3:35 p.m., about twenty minutes after the stop, and did not indicate that the search could be conducted at any remote location and at any other time. Nor did Melton or defendant consent to being taken to the Totowa barracks or to remain under detention, without probable cause, while the search was conducted. The consent provided:
I, Gregory D[.] Melton hereby authorize Tpr. M. Davis
#4373 [,] a member of the New Jersey State Police and any
other officer designated to assist, to conduct a complete
search of 1984 TAN PONTIAC 4 DOOR REGISTERATION
549THC OHIO. VIN # 2G2AT69H4E9705330 located at I-80
WESTBOUND MILE POST 63.2 SADDLEBROOK TWSP.,
N.J.
I further authorize the above member of the New Jersey
State Police to remove any letters, documents, papers, materials,
or other property which is considered pertinent to the
investigation, provided that I am subsequently given a receipt
for anything which is removed.
I have knowingly and voluntarily given my consent to search
without fear, threat, or promise (expressed or implied). In
addition I have been advised by TPR. M. DAVIS 4373 that I
have the right to refuse giving my consent to search.
Witnesses: ______________ x Gregory Melton
 (Signature of Person
 Consenting to Search)
 ______________ Date: 4-19-89 Time: 3:35/p.m.
The form on its face consents only to a search where the car was "located at I-80 WESTBOUND MILE POST 63.2 SADDLEBROOK TWSP., N.J."
"A warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." State v. Cooke, 163 N.J. 657, 664, 751 A.2d 92 (2000) (quoting State v. Alston, 88 N.J. 211, 230, 440 A.2d 1311 (1981)). The State has the burden of demonstrating that "one of those recognized exceptions" apply. Ibid. One of the exceptions for a search can be based on consent if the State sustains "the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent." State v. Johnson, 68 N.J. 349, 353-54, 346 A.2d 66 (1975).[4]Compare Schneckloth v. Bustamonte, *573 412 U.S. 218, 219, 93 S.Ct. 2041, 2044, 36 L.Ed.2d 854, 858 (1973) (noting that an established exception to the warrant or probable cause requirement is consent); and State v. Abreu, 257 N.J.Super. 549, 555, 608 A.2d 986 (App.Div.1992) (finding that "there is no constitutional requirement of reasonable suspicion as a prerequisite to seeking consent to search").[5]
The scope of a search extends to what is objectively reasonable, which is defined as what "the typical reasonable person [would] have understood" the scope to include. Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 1804, 114 L.Ed.2d *574 297, 302 (1991). Thus, a law enforcement officer may rely on a driver's apparent authority to consent to a search of the car and its contents, unless there is evidence to suggest that the driver does not own the property the officer wants to search. State v. Maristany, 133 N.J. 299, 306-07, 627 A.2d 1066 (1993); State v. Suazo, 133 N.J. 315, 320-21, 627 A.2d 1074 (1993). On the other hand, although it is "objectively reasonable for the police to conclude that the general consent to search [a] car included consent to search containers within that car," Florida v. Jimeno, supra, 500 U.S. at 251, 111 S.Ct. at 1804, 114 L.Ed.2d at 303, "[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk," id. at 251-52, 111 S.Ct. at 1804, 114 L.Ed.2d at 303.
We need not decide if Trooper Davis could have opened the trunk and the briefcase therein at the scene of the stop because Melton said he had no key thereto, or for any other reason. See Maristany, supra, 133 N.J. at 307, 627 A.2d 1066. Those considerations are irrelevant in this case. Our disagreement with the trial court flows from the fact the trunk was opened at a remote location from where the consent to search was given and opened approximately one hour later.
Here, Trooper Davis did not limit his search of the vehicle to the scene of the traffic stop. Rather, he directed defendant and Melton to return to the State Police barracks with him so he could conduct a further search. And that search was conducted outside the presence of defendant and Melton, so that Melton had no opportunity to terminate the search or limit the scope of the search into the trunk. See Abreu, supra, 257 N.J.Super. at 555-56, 608 A.2d 986. This fact is significant because the consent to search form in this case did not even purport to waive the consenting party's right to stop the search. See State v. Santana, 215 N.J.Super. 63, 72-73, 521 A.2d 346 (App.Div.1987). In any event, the search was conducted eight to ten miles from the location where the consent was given and long after the time the search was authorized. Accordingly, the search cannot be sustained upon the basis of consent.
Here, as in State v. Dickey, 152 N.J. 468, 706 A.2d 180 (1998), there is no question that the stop was lawful, and the question is only "whether the detention was `reasonably related in scope to the circumstances which justified the interference in the first place.'" Dickey, supra, 152 N.J. at 476, 706 A.2d 180 (quoting Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968)).
"`[T]here is [no] litmus-paper test for ... determining when a seizure exceeds the bounds of an investigative stop,'" nor "a `hard-and-fast time limit for a permissible Terry stop.'" Dickey, supra, 152 N.J. at 476, 706 A.2d 180 (citations omitted). To determine whether "a detention following a valid traffic stop" is reasonable, our courts apply the two-part test delineated by the United States Supreme Court in Terry v. Ohio, supra, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Dickey, supra, 152 N.J. at 476, 706 A.2d 180. The first factor is "whether the officer's action was justified at its inception." Ibid. The second is "whether [the officer's conduct] was reasonably related in scope to the circumstances which justified the interference in the first place." Ibid.
In Dickey the driver was stopped for driving under the speed limit at 10:36 p.m. The Court found that taking the driver and the defendant-passenger to the State Police barracks because they were nervous and could not provide the owner's name and address or the vehicle's registration and insurance card, and holding them at the barracks while awaiting the "narcotics detection dog" to arrive and signal the presence of narcotics in the trunk "sometime between one and two in the morning," id. at 472-73, 706 A.2d 180, was excessive, id. at 479, 706 A.2d 180. This was so *575 notwithstanding the defendant's execution of a consent to search form at 2:45 a.m. Id. at 473, 706 A.2d 180. In other words, "the combination of the duration of the detention and the degree of intrusion upon the liberty of the motorists exceeded" what is authorized by the Constitution. Id. at 479, 706 A.2d 180.
In articulating the Court's decision, Justice O'Hern noted the relevant factors in determining the difference between "an investigative stop and a de facto arrest," including the fact that "courts have ... held that transporting a suspect to another location or isolating him from others can create an arrest." Dickey, supra, 152 N.J. at 479, 706 A.2d 180 (citing United States v. Rose, 731 F.2d 1337, 1342 (8th Cir.), cert. denied, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed. 2d 263 (1984)). He also pointed out that "[a] detention that is the functional equivalent of an arrest must be supported by probable cause regardless of its duration." Id. at 478; see also United States v. Place, 462 U.S. 696, 709-10, 103 S.Ct. 2637, 2645-46, 77 L.Ed.2d 110, 122 (1983) (holding that the 90-minute detention of the defendant's luggage was excessive and constituted a Fourth Amendment violation, because "[t]he length of the detention of [defendant's] luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause.").
As our Supreme Court noted in Dickey, if a detention is "the functional equivalent of an arrest," it must be based on probable cause, regardless of the length of detention. Dickey, supra, 152 N.J. at 478, 706 A.2d 180. Indeed, even if a stop is no longer than required to investigate, it can still constitute "an illegal arrest if the stop is more than `minimally intrusive.'" Ibid. Thus, if the police officers' conduct is more intrusive than minimally required, an investigative stop will rise to a "de facto arrest." Ibid. Moreover, an investigative stop might be a de facto arrest if there is undue delay in the legitimate investigation by police, transporting a suspect to a different location or separating him from others, subjecting the person to unnecessary delays, putting the person in a police car, or handcuffing the person. Id. at 479, 706 A.2d 180.
Here, defendant and Melton were stopped at 3:15 p.m. for speeding and twenty minutes later the driver was asked to sign a consent to search form. The vehicle was then searched. However, the vehicle and its occupants were thereafter taken back to the police barracks, approximately eight to ten miles away, and about fifteen minutes later. Once there, the trooper searched the car for approximately ten additional minutes, and thereafter called for a drug-sniffing dog, which arrived approximately ten minutes after that. Thus, the total detention lasted at least an hour after the stop, and while the vehicle was searched at a time and place remote from the search permitted in the consent.
Hence, the search cannot be deemed to be the result of a valid consent. Nor can it be said that there was probable cause to search the vehicle independent of the consent. In State v. Lark, 319 N.J.Super. 618, 630, 726 A.2d 294 (App.Div. 1999), aff'd o.b., 163 N.J. 294, 297, 748 A.2d 1103 (2000), this court recently held, and the Supreme Court agreed, that even where, unlike here, a driver cannot produce his or her license, the police cannot search a vehicle's passenger compartment following a motor vehicle stop unless the officer has probable cause to believe a crime was committed or the evidence of a crime may be destroyed. Lark, 319 N.J.Super. at 630, 726 A.2d 294; see also Knowles v. Iowa, 525 U.S. 113, 118-19, 119 S.Ct. 484, 488, 142 L.Ed.2d 492, 498-99 (1998); State v. Carty, 332 N.J.Super. 200, 753 A.2d 149 (App.Div.2000). Here, there was no observation of the type of conduct which might justify a search of the vehicle. See, e.g., State v. Lund, 119 N.J. 35, 47-48, 573 A.2d 1376 (1990); State v. Waltz, 61 N.J. 83, 86-87, 293 A.2d 167 (1972). In the present case, Trooper Davis stopped the vehicle for speeding and, by his own admission, he did not have probable cause to believe a *576 crime had been committed. Indeed, he admitted that he only stopped the vehicle for a motor vehicle infraction, and that he saw no evidence of a crime in the vehicle. Mere nervousness does not give rise to probable cause justifying a search. Lund, supra, 119 N.J. at 47, 573 A.2d 1376.
As there is no basis on which to uphold the search in these circumstances, we reverse the denial of the motion to suppress. We remand to the trial court for further proceedings consistent with this opinion, including dismissal of the indictment.
KESTIN, J.A.D., concurring.
The result announced in the opinion of the court is eminently correct, but I would prefer to reach it by a far simpler and more straightforward reasoning process than the majority has employed. The only rationale I would use is actually contained in the penultimate paragraph of the opinion itself, as well as in State v. Carty, 332 N.J.Super. 200, 753 A.2d 149 (App.Div. 2000).
Manifestly, Trooper Davis's testimony provided no basis for a finding that, after he stopped an Ohio car for traveling sixtyseven miles per hour in a fifty-five mileper-hour zone, there was an articulable suspicion in the prevailing circumstances and the demeanor of the parties to believe that a crime was being or had been committed. The trooper, in his testimony, was unable to provide a factually specific or concrete basis for any such assessment. His evaluation was limited to the ubiquitous "they seemed unnaturally nervous," and other altogether-too-general characterizations so often used. Without even a suspicion he could articulate,[1] the trooper had no basis to request a consent to search, id., at 25-27, 754 A.2d at 751-52.[2] That being so, any evidence produced as a result of the consentwhether or not it would have been seen as properly discovered if the consent had been validly procuredmust be suppressed.
NOTES
[1] The motion was heard in defendant's absence, without objection, due to his non-appearance after being given notice in court.
[2] The parties later stipulated that the car was owned by a third party.
[3] We agree with defendant, as did Trooper Davis, that the trooper did not recall "a lot of details about this case." However, the motion followed the event by almost nine years, and that was attributable to defendant's incarceration in Ohio and Pennsylvania. We, therefore, have no dispute with the trial judge's findings that any lack of detail in Davis' recitation was attributable to the fact "this happened nine years ago."
[4] The State does not claim that defendant has no standing to challenge the consent. See Alston, supra, 88 N.J. at 218-29, 440 A.2d 1311; cf. State v. Maristany, 133 N.J. 299, 304-08, 627 A.2d 1066 (1993) (discussing various scope of consent issues raised by defendant even though the driver signed the consent to search form). In any event, particularly given this defendant's detention for a lengthy period, and his being taken to a distant location for purposes of the search, we are dealing with more than a mere challenge to the consent given by Melton.
[5] Abreu could be read to sustain the search in the present case if it occurred at the scene of the stop or in close proximity thereto. Id. at 552-53, 56. Indeed, as recently as last December we said "reasonable suspicion is not a prerequisite to seeking consent to search." State v. Contreras, 326 N.J.Super. 528, 537, 742 A.2d 154 (App.Div.1999) (citations omitted). The Interim Report, however, noted the need to "reaffirm the existing policy that a State Police member may request permission to conduct a search only when facts are present that constitute a reasonable, articulable suspicion to believe that the search will uncover evidence of a crime." Interim Report at 85. The Interim Report states:

6. Procedures Governing Consent Searches.
The [State Police] Superintendent should within 120 days of this Report issue a single, comprehensive Standard Operating Procedure to replace, update, and supersede all existing Standard Operating Procedures regarding consent searches. The Standard Operating Procedure should reaffirm the existing policy that a State Police member may request permission to conduct a search only when facts are present that constitute a reasonable, articulable suspicion to believe that the search will uncover evidence of a crime. The approved State Police Consent to Search form should be reviewed and revised as necessary to account for the provisions of the revised Standard Operating Procedure.
The Standard Operating Procedure should also include provisions to require that:
1. All State Police members initiating a consent search incident must utilize a Search Incident form which includes all information necessary to document and record the search incident.
2. The Search Incident Form will provide that all consent searches require written authorization before the search is initiated.
3. In all instances, written authorization on the Search Incident form will be obtained before any search is begun.
4. The Search Incident form must be completed whether or not permission to search was granted and must include all circumstances which constituted the reasonable suspicion giving rise to the request.
5. No consent searches shall be conducted on the basis of verbal or "implied" consent.
6. Notwithstanding the holding in Ohio v. Robinette, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), all State Police members must advise any person being asked to give permission to search that he or she is free to leave when, in fact, such is the case.
7. The Search Incident form should specifically inform the person being asked to give permission to search that he or she has the right to be present during the consent search.
8. The immediate supervisor of the State Police member initiating a consent search incident is responsible to review the circumstances and outcome of the incident within 24 hours.
9. Where a State Police vehicle is equipped with a video camera, the entire consent search incident will be recorded.
[Interim Report at 85-86.]
We recognize that State Police internal regulations are not dispositive with respect to constitutional law. However, in light of the Interim Report, another Part of this court has just held "that articulable suspicion is a necessary prerequisite under the New Jersey Constitution to requesting a consent to search after a routine stop for a traffic violation." State v. Carty, 332 N.J.Super. 200, 753 A.2d 149 (App.Div.2000). But see, e.g., State v. Abreu, supra, 257 N.J.Super. at 555, 608 A.2d 986. We need not explore the issue further because the search in this case was unlawful based on traditional constitutional values.
[1] The passage of nine years from the incident to the trooper's testimony at the suppression hearingwhatever the reason for the hiatus cannot be a surrogate for the minimal specificity required to satisfy the articulable suspicion standard.
[2] The contrary idea stated in State v. Abreu, 257 N.J.Super. 549, 555, 608 A.2d 986 (App. Div.1992), State v. Allen, 254 N.J.Super. 62, 66, 603 A.2d 71 (App.Div. 1992), and in 3 LaFave, Search and Seizure, sec. 8.1 at 32 n5.1 (Supp.1992), and relied upon in more recent cases, see, e.g., State v. Contreras, 326 N.J.Super. 528, 537, 742 A.2d 154 (App.Div. 1999); State in the Interest of J. G., 320 N.J.Super. 21,30, 726 A.2d 948 (App.Div. 1999); State v. Walker, 282 N.J.Super. 111, 116, 659 A.2d 527 (App.Div. 1995), is at variance with the principles and considerations which undergird established concepts of due process and fundamental fairness in this State. The personal privacy values and personal integrity interests intrinsic to our sense of a free society forbid governmental intrusion grounded on a police officer's curiosity or some undefinable "feeling" he or she may have, coupled with that officer's ability to persuade, cajole, or otherwise influence a citizen into surrendering so basic a right.