**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1367-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ORLANDO A. HERNANDEZ,
a/k/a ORLANDO HERNANDEZ,
HERNANDEZ, ORLANDO
ARNOLD, ORLANDO
HERNANDEZ JR., ORLANDO
FERNANDEZ, WILLIAM
BONURA, and CAPONE,

    Defendant-Appellant.

_____

Argued November 4, 2021 – Decided December 13, 2021

Before Judges Fuentes, Gilson, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 16-03-0363.

S. Emile Lisboa, IV, argued the cause for appellant (Galantucci & Patuto, attorneys; S. Emile Lisboa, IV, of counsel and on the brief).

Jaimee M. Chasmer, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; William P. Miller, Assistant Prosecutor, of counsel; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

After a judge denied his motion to suppress evidence seized during a purportedly consented-to motor-vehicle search, defendant Orlando A. Hernandez was tried before a jury on various drug-related offenses. Before receiving the jury's verdict, the trial judge learned the jury foreperson had left the jury room for an unknown time after the jury had begun deliberations and before it reached a verdict. Declining to interview each of the jurors to determine whether they had deliberated while the foreperson was absent, the trial court denied defendant's motion for a mistrial and accepted the jury's verdict convicting defendant of all charges. Because the motion judge should have granted the motion to suppress and the trial judge should have interviewed the jurors, we reverse.

I.

We glean the following facts from the record developed during the suppression hearing and trial.

2

A.

While driving a patrol vehicle early on September 21, 2015, Lyndhurst police officer Paul F. Haggerty stopped at a red light, directly behind defendant's vehicle. From his vantage point, he could not read the vehicle's temporary registration, which was displayed in the top left corner of the vehicle's rear windshield. Because he could not read the temporary registration and because the vehicle did not have a driver's-side exterior rearview mirror, he decided to stop defendant's vehicle.

At about 1:12 a.m., the traffic light turned green, defendant's vehicle moved forward to merge onto a highway, and Haggerty activated his emergency lights and siren, attempting to "corral" defendant and prevent him from entering the highway. After defendant pulled his car over to the right side of the road, Haggerty exited his vehicle and approached the driver's side of defendant's vehicle. As he approached the vehicle, Haggerty was able to view the registration number. He saw in the vehicle a single occupant, later identified as defendant, and smelled burnt marijuana coming from the passenger compartment. Haggerty radioed headquarters and requested back-up "for officer safety purposes." Haggerty asked defendant if anyone had smoked marijuana in

3

the vehicle; defendant told him a friend had smoked marijuana in the vehicle earlier that evening, but the vehicle did not then contain any marijuana.

Officer DeCamp arrived as back-up. Haggerty asked defendant to step out of his vehicle, hoping to get "a better interview" with him. Haggerty characterized defendant's demeanor as "[a]rgumentative, challenging the basis for the stop." In response to Haggerty's questions, defendant told Haggerty he was coming from a friend's house, indicating the house was "over there," without providing the friend's name or address. Haggerty characterized those responses as "evasive." It isn't clear from the record whether Haggerty asked for the friend's name or address. Because of the suspected marijuana and the "potential of concealed weapons," Haggerty conducted a pat-down search of defendant and did not find any weapons, drugs, or other contraband on him.

Because of the "evasive" responses and the burnt-marijuana odor, Haggerty asked for defendant's consent to search his vehicle. When defendant declined to give his consent, Haggerty asked his supervisor, Lieutenant Michael Carrino, to come to the scene so he could authorize a request for the assistance of a Bergen County K-9 dog unit. Haggerty wanted the assistance of a K-9 unit because of "a suspicion based on the odor present, . . . the admission that somebody had smoked in the vehicle, . . . the argumentative behavior, and the

evasive responses, as well as [his] suspicions that there may have been something illegal in the vehicle, whether it be contraband or weapon." Carrino arrived at the scene, spoke with Haggerty, and authorized the request of the K-9 unit.

Bergen County Sheriff's Officer Joseph Cutrona arrived on the scene with a narcotics dog. Cutrona's dog conducted an "exterior sniff of the vehicle." During that process, the dog alerted Cutrona to the possibility of the presence of narcotics by scratching at the front passenger-side bumper of the vehicle and at the seam between the driver's door and the rear passenger's door.

Haggerty advised defendant the dog had "hit positive for potential narcotics present in the vehicle" and that their next step would be to "impound the vehicle and apply for a search warrant." Defendant's home address was in Trenton. Haggerty thought it was "fair and reasonable" to ask again for defendant's consent to the search instead of seeking a search warrant because the search warrant process "could take several hours," defendant's home in Trenton was "not the close[s]t proximity to our jurisdiction," and there was "no other transportation home" for defendant if they impounded defendant's vehicle.

Haggerty told defendant, "I'll provide you with one final opportunity to consent. If not, we're going to be making [an] application for a search warrant

and impounding the vehicle, and releasing you from the scene." Defendant consented to a search of the areas "where the dog hit." Rejecting defendant's consent to search just those areas, Haggerty advised defendant "that [is] not how a consent search works." Haggerty told him, "it's the entire vehicle" and "[t]he consent to search is not a specific area . . . it's . . . every compartment within, bumper to bumper." Lieutenant Carrino confirmed Haggerty's statement that any consent had to be of "the entire vehicle and every compartment within, not just where the dog hit." As to his rights with regards to the consent to search, Haggerty advised defendant:

> He had the . . . right to refuse . . . or stop . . . or if he had provided consent, stop the search at any time during the course of it. If he refused, he would be told that he'd be released on the scene once we identified him properly and we'd impound the vehicle for a search warrant application . . . .

Haggerty provided defendant with a "CONSENT TO SEARCH MOTOR VEHICLE" form and read it to him "line by line." Haggerty filled in portions of the form. For example, on the portion of the form stating "I, _____, do hereby consent to have members of the Lyndhurst Police Department and all other law enforcement agenc[ies] who may be cooperating with them, to conduct a complete search of: _____," Haggerty filled in defendant's name and

6

wrote "my vehicle" and a description of the vehicle in the blanks provided to describe the extent of the search. The form also contained these provisions:

> I further authorize the same officers to remove any and all papers, property and effects which they may consider pertinent to their criminal investigation. I give this consent to search knowingly and voluntarily without fear, threat, coercion or promise of any kind. I have been further advised that I may withdraw my consent at any time during the search.
>
> I have been advised by [Haggerty] and fully understand that I have the right to refuse giving my consent to search and am aware that if I wish to exercise this right it would be respected.

Haggerty and defendant were both holding the form as Haggerty read it to defendant. Haggerty did not provide the form to defendant for his individual review. After Haggerty finished reading the form, defendant signed it.

Haggerty and Cutrona conducted the vehicle search. They had different recollections of how they conducted the search; Haggerty's recollection differed between his direct- and cross-examination testimony at the suppression hearing. Haggerty described the vehicle as having a "rear seat pass through" to the trunk compartment. During direct examination, Haggerty testified Cutrona, while in the rear seat of the vehicle, had "pulled a toolbox through the pass hole," "opened up the toolbox, [and] located a plastic shopping bag." The bag contained a substance Haggerty suspected based on its packaging was cocaine.

7

On cross-examination, Haggerty testified the toolbox had remained in the trunk and "we pulled the contraband through the hole, from the toolbox." He described the toolbox as having "snaps on it." He denied being "hands on with the toolbox." They did not seize the toolbox and secure it as evidence because his police department had a small evidence room and the toolbox was "too large and it takes up space for unnecessary reasons."

Cutrona described the vehicle as having seats that could be folded down. According to Cutrona, he opened the rear passenger door, folded down the rear seat, reached in, found a metal toolbox behind the rear passenger seat on the driver's side, put his hand in the toolbox, was "pricked" by something, and pulled his hand back. Haggerty then searched the toolbox and found the bag that contained the cocaine.

Haggerty arrested defendant, handcuffed him, and issued tickets for operation of a motor vehicle while in possession of a controlled dangerous substance, N.J.S.A. 39:4-49.1, improper display of registration plates, N.J.S.A. 39:3-33, and failure to have a driver's side, external rearview mirror, N.J.S.A. 39:3-71. DeCamp transported defendant to police headquarters, when, for the first time, he was advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Police subsequently determined the plastic shopping bag contained 9.7

ounces of cocaine. They did not find any raw or burnt marijuana in the vehicle or any drugs in the areas identified by the narcotics dog.

B.

A grand jury indicted defendant and charged him with first-degree possession of five or more ounces of cocaine with the intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(1); third-degree possession of cocaine, N.J.S.A. 2C:35-10(a)(1); third-degree possession of cocaine with intent to distribute while within 1,000 feet of a school, N.J.S.A. 2C:35-7; and second-degree possession of cocaine with intent to distribute while within 500 feet of a public park, N.J.S.A. 2C:35-7.1. The State dismissed the last two charges before trial.

Defendant moved to suppress all evidence seized during the September 21, 2015 vehicle stop. The motion judge conducted a two-day evidentiary hearing, during which the State called Haggerty and Cutrona and defendant called a witness admitted by the judge as a dog-sniff expert.

In a written opinion, the motion judge denied defendant's motion. She found Haggerty's stop of defendant's vehicle was supported by Haggerty's reasonable and articulable suspicion defendant had been or was committing a Title 39 offense, specifically violations of N.J.S.A. 39:3-33 and -71 for, respectively, affixing the temporary registration improperly to the rear

windshield and not having a driver's-side, external rearview mirror. Although she found the pat-down search had violated defendant's constitutional rights, the motion judge concluded the discovery of the cocaine was sufficiently attenuated from the unlawful pat-down search to permit its introduction into evidence at trial. The motion judge held the removal of defendant from the vehicle, the narcotics-dog sniff, and the vehicle search had not violated defendant's rights. With respect to the vehicle search, the judge found defendant knowingly and voluntarily had consented to the search.

Although she found both Haggerty and Cutrona to be credible, the motion judge did not address or resolve some of the inconsistencies in their testimony regarding how they conducted the vehicle search. For example, she did not address the officers' directly divergent testimony as to which of them opened the toolbox and found the cocaine and Haggerty's conflicting testimony that Cutrona had pulled the toolbox through the pass hole and that the toolbox had never left the trunk. In rendering her decision, the motion judge also made factual findings that were not supported by the record. For example, she found defendant had advised Haggerty he had "just come from a friend's house, but could not remember the friend's name." Haggerty did not testify defendant had said he could not remember his friend's name or that he had asked defendant to provide

his friend's name. The motion judge found defendant's purported "failure to provide the location or name of the friend" to be "the sort of evasive responses that might suggest [defendant] had smoked marijuana earlier." From that finding, she concluded defendant had admitted his guilt before consenting to the search, a factor she considered in holding defendant's consent had been voluntary.

## C.

A jury and a different judge presided over defendant's trial. The trial judge included in the jury charge the following instructions, each of which is contained in the Model Criminal Jury Charges:

- The verdict must represent the considered judgment of each juror and be unanimous as to each charge. This means all of you must agree if the defendant is guilty or not guilty on each charge.

- It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment.

- Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.

- In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous but not

11

> – but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.
>
> • Your verdict, whatever it may be as to each crime charged, must be unanimous. Each of the twelve members of the deliberating jury must agree as to the verdict.

After naming juror number one as the foreperson, the trial judge instructed "[y]ou will preside over the deliberations and tell us a verdict when it's reached" and "[i]t is your responsibility to lead the deliberations."

The jury received the case at 4:19 p.m. Pressing a buzzer, the jury notified the court clerk it had reached a verdict at about 5:00 p.m. Around 5:05 p.m., the trial judge became aware juror number one had left the jury room to use the hallway bathroom several minutes before the jury had pressed the buzzer indicating it had reached a verdict. The trial judge saw the back of the juror leaving but thought he was a staff member. Defense counsel saw the juror in the hallway entering the restroom; he returned to the courtroom to advise the court clerk he had seen a juror in the hallway.

Before the jury returned its verdict, the trial judge had juror number one brought into the courtroom and examined him under oath. The judge told juror number one, "[n]ormally, when a jury is impaneled, you cannot leave that room"

12

and asked him what had happened.  Juror number one stated he had left the jury room to use the restroom in the hallway.  He stated no one was in the restroom and he "did not speak to anybody" while using the restroom.

The trial judge asked him if deliberations had "concluded at that point." He initially responded, "Yes, Your Honor."  However, on further inquiry, juror number one stated deliberations had not concluded before he left the jury room but only after he had returned from the restroom:

> THE COURT:  Had the deliberations concluded at that point?
>
> JUROR NUMBER ONE:  Yes, Your Honor.
>
> THE COURT:  So you concluded with your fellow jurors coming to some conclusion.  And then you just decided to run to the restroom quickly before you came out.  Is that it?
>
> JUROR NUMBER ONE:  If -- no.  At the time when I used the restroom, not everybody was set on a unanimous answer.  But I had to use the restroom, so I just went to the restroom.  I really just had to use the restroom.
>
> THE COURT:  You're – believe me, I understand.  So then when you came back –
>
> JUROR NUMBER ONE:  Yes, Your Honor.
>
> THE COURT:  -- did you, as a collaborative group, did you come to some conclusion, all of you together?

A-1367-19

JUROR NUMBER ONE: Yes. When I came back, we decided on a decision.

As juror number one was being moved into a different room, counsel noticed he had a piece of paper in his hand. Because it might have been the verdict sheet, the trial judge asked a sheriff's officer to retrieve it from him and place it in an envelope.

Outside of the presence of the jurors, counsel and the trial judge agreed, based on juror number one's testimony, the other members of the jury could have deliberated while juror number one was out in the hallway restroom. The trial judge discussed with counsel what action the court should take, contemplating sending juror number one back into the jury room to confirm that the jurors were in agreement, excusing him and seating one of the alternate jurors on the jury, or conducting a voir dire of the other jurors to determine whether they continued to deliberate after juror number one had left the jury room. The trial judge decided to excuse the jurors for the day and to bring them back the next day to voir dire them on "their perception of the status of the deliberations . . . when that one juror departed."

The following day, defense counsel asked for a mistrial, "based on the observations that we know already" and on Rule 1:8-2(a)'s requirement that a "deliberating jury in a criminal action . . . consist of 12 persons." Alternatively,

14

he argued the court had to conduct a voir dire of the other jurors "as to whether or not the case was discussed while [juror] number [one] was out of the room." The trial judge denied both requests. The judge found voir dire of the remaining jurors "could have no meaningful conclusion or resolution. In fact, it could open the door to our peeking into the inside of actually what happened in that jury room." Noting that "people need to use bathrooms during their deliberations" and "[w]e don't directly instruct jurors to stop communicating when a juror is using the bathroom," the judge decided to "accept the verdict from the jury undisturbed." The jury found defendant guilty of both counts.

Defendant moved for a judgment of acquittal notwithstanding the verdict pursuant to Rule 3:18-2 or, alternatively, for a new trial pursuant to Rule 3:20-1, arguing, among other things, that the jury's "deliberations did not consistently occur between all twelve jurors" and that the "absence of a juror for several minutes during deliberation" was cause for a new trial. The trial judge denied the motion in its entirety in a written opinion. Because the "court ha[d] no information showing that the defendant was prejudiced by the brief absence of juror number one," the judge held

> this separation holds no greater prejudicial weight than if juror number one were to use the restroom in the jury room. Were he to use the restroom alone in the jury room, the court assumes that the door would be closed,

15

and the juror would have been unable to participate in any deliberations that may have taken place in the common area of the jury room during that time. Additionally, the court has no reason to believe that substantial deliberation took place among the remaining eleven jurors while [juror number one] was briefly out of the room.

The judge also concluded, based on a jury charge that the jury foreperson would lead all jury deliberations, she had to "assume, absent any evidence to the contrary, that the jurors did not deliberate without the foreperson."

The trial judge subsequently sentenced defendant to a term of twenty-years imprisonment with ten years of parole ineligibility.

In this appeal, defendant argues:

POINT I: THE STOP, CUSTODIAL DETENTION OF DEFENDANT, AND THE SEARCH OF HIS VEHICLE VIOLATED DEFENDANT'S RIGHTS UNDER THE FOURTH AMENDMENT AND ART. I, PARA. 7 OF THE NEW JERSEY CONSTITUTION; AND ALL EVIDENCE DERIVED THEREFROM, BOTH VERBAL AND PHYSICAL, SHOULD HAVE BEEN SUPPRESSED.

A. The stop of Defendant's vehicle was without reasonable suspicion of a motor vehicle violation.

B. The Defendant was unlawfully in "custody," the constitutional equivalent of an "arrest" from the outset of the stop of his vehicle.

16

C. The deficient training and certification of both the drug sniffing dog and his handler; the conduct of the instant canine search in violation of established standards; and the false reactions of the canine were inadequate to establish probable cause to search.

POINT II: THE COURT BELOW ERRED IN FAILING TO GRANT DEFENDANT'S MOTION FOR A MISTRIAL, AND MOTION FOR A NEW TRIAL BECAUSE HE WAS CONVICTED BASED ON THE "DELIBERATIONS" OF ONLY 11 JURORS.

POINT III: THE COURT ABUSED ITS DISCRETION IN ALLOWING THE STATE TO FILE ITS MOTION FOR AN EXTENDED TERM WELL BEYOND THE TIME REQUIRED BY R. 3:21-4(E); BY FAILING TO GIVE PROPER WEIGHT TO A MITIGATING CIRCUMSTANCE; AND BY FAILING TO APPLY A PAROLE INELIGIBILITY PERIOD OF ONE THIRD THE TERM IMPOSED.

## II.

Our scope of review of a suppression decision is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). We uphold a trial court's factual findings made in connection with a motion to suppress when "those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Elders, 192 N.J. 224, 243 (2007)). We defer to a trial court's factual findings because they are "informed by [the court's] first-hand assessment of the credibility of the witnesses . . . ." State v. Lentz, 463 N.J. Super. 54, 67 (App. Div. 2020). "[A]

17

trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court," State v. S.S., 229 N.J. 360, 374 (2017), but only if the findings are "so clearly mistaken that the interests of justice demand intervention and correction," State v. Gamble, 218 N.J. 412, 425 (2014) (quoting Elders, 192 N.J. at 244). We review de novo a trial court's legal conclusions. Ahmad, 246 N.J. at 609.

A.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution forbid law enforcement from conducting unreasonable searches and seizures. State v. Terry, 232 N.J. 218, 231 (2018). A warrantless search or seizure is presumptively unreasonable and invalid. State v. Chisum, 236 N.J. 530, 545 (2019); State v. Hagans, 233 N.J. 30, 38 (2018).

A "roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions." State v. Dunbar, 229 N.J. 521, 532 (2017). "To be lawful, an automobile stop 'must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed.'" State v. Bacome, 228 N.J. 94, 103 (2017) (quoting

State v. Carty, 170 N.J. 632, 639-40 (2002)). The required "'articulable reasons' or 'particularized suspicion' of criminal activity must be based upon the law enforcement officer's assessment of the totality of circumstances with which he is faced . . . in view of [the] officer's experience and knowledge, taken together with rational inferences drawn from those facts." State v. Davis, 104 N.J. 490, 504 (1986).

Haggerty decided to stop defendant's vehicle because from his initial vantage point he could not read the vehicle's temporary registration, which was displayed in the top left corner of the vehicle's rear windshield, and because the vehicle did not have a driver's-side exterior rearview mirror, which the State asserts are traffic offenses pursuant to N.J.S.A. 39:3-33 and 39:3-71. Haggerty failed to explain how the display of the temporary registration violated N.J.S.A. 39:3-33. For example, he did not assert it was marred by "grease, dust, or other blurring matter" or failed to meet the requirement that it be displayed "not less than 12 inches nor more than 48 inches from the ground in a horizontal position." N.J.S.A. 39:3-33. The motion judge's finding that the temporary registration was affixed "improperly" to the rear windshield in violation of N.J.S.A. 39:3-33 and thereby provided reasonable and articulable suspicion an offense was being committed was not supported factually or legally.

Defendant asserts "Haggerty's testimony makes clear" Haggerty noticed the missing mirror after he had decided to stop the vehicle. That assertion is not supported by the record. In both his direct and cross examinations, Haggerty identified the missing mirror as a reason he decided to stop defendant's vehicle. That consistent, and as found by the motion judge, credible testimony regarding the missing mirror supports the conclusion Haggerty had a reasonable and articulable suspicion that an offense, specifically a violation of N.J.S.A. 39:3-71, was being committed. That alone is sufficient to support Haggerty's decision to stop defendant's vehicle.

B.

Next, we turn to the propriety of the search of the vehicle and toolbox. "[O]ur constitutional jurisprudence evinces a strong preference" for searches conducted pursuant to "judicially issued warrants." Elders, 192 N.J. at 246. For a court to find permissible a warrantless search, the State must prove the search fell within one of the few recognized exceptions to the warrant requirement. Chisum, 236 N.J. at 545. "Consent to search is a 'long-recognized' exception to the warrant requirement." State v. Hagans, 233 N.J. at 39 (quoting State v. Coles, 218 N.J. 322, 337 (2014)). In consent-based searches, the State must prove consent was given "knowingly and voluntarily." State v. Carty, 170 N.J.

632, 639, modified by 174 N.J. 351 (2002); see also State v. Johnson, 68 N.J. 349, 354 (1975) (finding "an essential element of" a voluntary consent "is knowledge of the right to refuse consent").

To establish a defendant knowingly consented to a warrantless search, the State must prove the defendant before consenting understood he had the right to refuse to consent to the search and that by consenting, he was waiving that right. Hagans, 233 N.J. at 39. The State must show "the individual giving consent knew that he or she 'had a choice in the matter.'" Carty, 170 N.J. at 639 (quoting Johnson, 68 N.J. at 354). "One cannot be held to have waived a right if he was unaware of its existence." Johnson, 68 N.J. at 354.

The motion judge erred in concluding defendant had knowingly consented to the search. She based that conclusion in part on her finding Haggerty "had advised [d]efendant that he had the right to refuse or could stop the search, but if that occurred, Haggerty would apply for a search warrant." That finding is not supported by Haggerty's testimony. Instead, Haggerty's testimony demonstrates the police misinformed defendant of his rights and gave defendant contradictory and convoluted instructions that prevented him from knowingly consenting to the search.

Defendant expressly wanted to limit his consent to a search of the areas of the vehicle "where the dog hit." That was his right. "A suspect may of course delimit as he chooses the scope of the search to which he consents." Florida v. Jimeno, 500 U.S. 248, 252 (1991); see also State v. Hampton, 333 N.J. Super. 19, 30 (App. Div. 2000) (finding a suspect has the right to limit the scope of his consent to a motor-vehicle search); State v. Santana, 215 N.J. Super. 63, 72 (App. Div. 1987) (finding "the scope of a consent search is limited by the terms of its authorization"). Instead of respecting defendant's right to limit the scope of his consent, Haggerty misstated the law and incorrectly advised him, "that [is] not how a consent search works" and told him, "it's the entire vehicle" and "[t]he consent to search is not a specific area . . . ." Lieutenant Carrino, instead of correcting Haggerty's misstatement of defendant's rights regarding the consent to search, confirmed it, saying any consent had to be of "the entire vehicle . . . not just where the dog hit." Because defendant's consent was based on the police officers' misstatement of his rights, it was not a knowing consent.

Although the consent form stated defendant could "withdraw [his] consent at any time during the search" and Haggerty told him he could "stop the search at any time during the course of it," Haggerty's instruction that if defendant consented to the search, he was consenting to a search of the entire vehicle

directly contradicted the statement about his right to withdraw his consent after the search began. By repeatedly telling him he could consent only to a search of the entire vehicle, the police stripped defendant of the knowledge of his right to limit the scope of his consent, to stop the search once it had begun, and to withdraw his consent after a partial search had occurred.

The State also failed to establish that the search of the toolbox and the bag in the toolbox was lawful. A lawful consent search depends on a knowing and fully informed consent that authorizes the places to be searched. Jimeno, 500 U.S. at 252; Hampton, 333 N.J. Super. at 30. Haggerty's testimony did not establish that defendant consented to a search of closed containers in the trunk. Neither did the consent form, which referenced only the vehicle and said nothing about closed containers contained in the vehicle. See State v. Maristany, 133 N.J. 299, 302 (1993) (finding lawful a search of luggage based on a consent-to-search form authorizing a search of the vehicle and luggage found in its trunk). Moreover, Haggerty's testimony did not establish probable cause for a search of a closed container in the trunk. The narcotics dog indicated that there might be drugs in the front of the vehicle or in the passenger section near the seam between the front and rear doors. Those hits did not establish probable cause for a search of a closed container in the trunk.

The lack of probable cause to open the toolbox found in the trunk was compounded by the inaccurate description of defendant's right to limit the scope of his consent to the search. But for the mixed messages and inaccurate information about his rights the police gave him, defendant might have protested the search of the toolbox. See Hampton, 333 N.J. Super. at 30 (finding defendant had been deprived of right to terminate search or limit scope of search into trunk); State v. Abreu, 257 N.J. Super. 549, 555-56 (App. Div. 1992) (finding defendant could have protested search of a bag in a motor-vehicle stop).

The record is too murky to establish defendant understood his rights regarding consenting to the search. In fact, the record demonstrates a misunderstanding, based on the police officers' inaccurate statements, of what his rights were. Because the State failed to prove defendant understood his rights, the motion judge erred in finding defendant voluntarily and knowingly consented to the search and erred in denying the suppression. Accordingly, we reverse.

## C.

We "will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." State v. Jackson, 211 N.J. 394, 407 (2012); see also State v. Smith, 465 N.J. Super. 515, 532 (App.

Div. 2020). "To address a motion for a mistrial, trial courts must consider the unique circumstances of the case." State v. Smith, 224 N.J. 36, 47 (2016). "If there is 'an appropriate alternative course of action,' a mistrial is not a proper exercise of discretion." Ibid. (quoting State v. Allah, 170 N.J. 269, 281 (2002)). The appropriate and required course of action here was to interview the eleven jurors who remained in the jury room during juror number one's absence to determine if they deliberated during his absence. The trial judge's failure to follow that requested course of action was an abuse of discretion that resulted in a manifest injustice – the deprivation of defendant's right to a fair trial.

This issue regarding juror number one's absence raised a concern that defendant was deprived of his fundamental right to a fair trial. To have a fair trial, given that the parties had not stipulated otherwise in writing with court approval, defendant had to have a "deliberating jury . . . consist[ing] of 12 persons." R. 1:8-2(a); see also State v. Gleaton, 446 N.J. Super. 478, 522 (App. Div. 2016). The allegation of juror number one's misconduct in leaving the jury room required the trial judge to make a "probing inquiry into the possible prejudice caused by any jury irregularity." State v. Scherzer, 301 N.J. Super. 363, 487-88 (App. Div. 1997); see also Barber v. Shop-Rite of Englewood & Assocs., Inc., 406 N.J. Super. 32, 54 (App. Div. 2009). "Where the record does

not show whether the irregularity was prejudicial, it will be presumed to be so." Scherzer, 301 N.J. Super. at 486.

We know for some time period after deliberations began and before a verdict was reached, only eleven jurors were present in the jury room. What we don't know – because the trial judge chose not to ask the eleven people in the room, the only people with knowledge – is whether they deliberated while juror number one was absent and whether defendant had, for that period of time, a "deliberating jury" of only eleven people.

Resolution of that issue required asking the jurors one question: did the jury continue to deliberate while juror number one was absent? Asking that direct question would not have been an "invasion of [the jury's] sacred process," as the trial judge found. In fact, it would have had no impact on the deliberations. The verdict, though not announced, had already been reached. Questioning the jurors had no potential to disrupt jury deliberations.

Instead of questioning the jurors, the trial judge "assume[d], absent any evidence to the contrary, that the jurors did not deliberate without the foreperson," relying on the jury instructions that the foreperson would "preside over the deliberations" and "lead the deliberations." First, there was no "evidence to the contrary" because the only people with knowledge, the jurors

who remained in the jury room, weren't asked.  Second, the judge's reliance on those instructions was misplaced.  Although we generally presume jurors follow instructions, see State v. Armour, 446 N.J. Super. 295, 314 (App. Div. 2016), we know juror number one did not follow the foreperson instructions.  Instead of presiding over and leading the deliberations, he left the jury room before a verdict was reached, walked out into the hallway, and was absent from the jury room for an unknown period of time.  Leaving the jury room and courtroom to go out to use a restroom in the public hallway is simply not the same thing as using a restroom in the jury room within feet of the other jurors.  See State v. Rios, 314 S.W.3d 414, 420 (Mo. Ct. App. 2010) (finding jurors' use of restroom inside the jury room was not juror separation); State v. Jackson, 659 S.E.2d 73, 76 (N.C. Ct. App. 2008) (finding "the jury bathroom . . . to be part of the jury room").

We appreciate the difficult and unusual position in which the trial judge found herself.  But to ensure defendant had a fair trial before a deliberating jury of twelve people – which was his right – she had to question the jurors.  Failure to do so was an abuse of discretion requiring reversal.

27

D.

Defendant's remaining arguments are without sufficient merit to warrant discussion in a written opinion.  See R. 2:11-3(e)(2).

Reversed and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1367-19